FILED
CLERK, U.S. DISTRICT COURT

JAN 2 6 2011

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

June 2010 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. CR **CR 11 00072** |
| Plaintiff, | **I N D I C T M E N T** |
| v. | [18 U.S.C. § 1962(d): Racketeer Influenced and Corrupt |
| MHER DARBINYAN,<br>  aka "Mike,"<br>  aka "Hollywood Mike,"<br>  aka "Little Mike,"<br>  aka "Capone,"<br>  aka "Caps,"<br>  aka "Maher," | Organizations Conspiracy;<br>18 U.S.C. § 1201(c): Conspiracy to Commit Kidnapping; 18 U.S.C. § 1201(a): Kidnapping; 18 U.S.C. § 1951(a): Conspiracy and Interference with Commerce by Threats and Violence; 18 U.S.C. |
| PARAMAZ BILEZIKCHYAN,<br>  aka "Parik,"<br>  aka "P,"<br>  aka "Parnamas<br>    Bileziktsian,"<br>  aka "Bleziktsian Paramas," | § 1344: Bank Fraud; 18 U.S.C. § 1028A: Aggravated Identity Theft; 18 U.S.C. § 1029: Access Device Fraud; 18 U.S.C. § 371: Conspiracy; 18 U.S.C. |
| KARO YERKANYAN,<br>  aka "Guilty,"<br>  aka "Gator,"<br>  aka "Kane," | § 1001(a)(2): False Statement;<br>18 U.S.C. § 1014: False Statement on a Loan Application; 18 U.S.C. § 1028: Identity Theft; 21 U.S.C. |
| ARMAN SHAROPETROSIAN,<br>  aka "Horse,"<br>  aka "Dzi," | § 846: Conspiracy to Manufacture and Possess with Intent to Distribute Marijuana; 21 U.S.C. §§ 841(a)(1), (b)(1)(B)(vii), |
| HAYK KARAYAN,<br>  aka "Hayko,"<br>  aka "Whisper," | (b)(1)(C): Manufacture and Possession with Intent to Distribute Marijuana; 18 U.S.C. |
| ARMAN TANGABEKYAN,<br>  aka "Spito,"<br>  aka "Spitak,"<br>  aka "Villager,"<br>  aka "Thick Neck,"<br>  aka "Armancho," | § 1955: Conducting Illegal Gambling Business; 18 U.S.C. § 922(g)(1): Felon in Possession of a Firearm/Ammunition;<br>18 U.S.C. § 2: Aiding and Abetting] |

```
 1   EMIL AIRAPETIAN,                          )
          aka "Clever,"                        )
 2        aka "Emo,"                           )
     ARMEN HOVANISSIAN,                        )
 3        aka "Sniper,"                        )
          aka "Arm,"                           )
 4        aka "Armen Hovanessian,"             )
     ROMAN TEROGANESYAN,                       )
 5        aka "Lil Boy,"                       )
          aka "Rome,"                          )
 6        aka "Roman Teroganesian,"            )
          aka "Arthur Teroganesian,"           )
 7   EDGAR KHACHATRYAN,                         )
          aka "Gunner,"                        )
 8        aka "Lil Gunner,"                    )
          aka "Edo,"                           )
 9   GARIK GALSTYAN,                            )
          aka "Stomper,"                       )
10        aka "Stomps,"                        )
     HARUT TOROSYAN,                            )
11        aka "Menace,"                        )
          aka "Harout Torosyan,"               )
12   SOUREN SEROBYAN,                           )
          aka "Suro,"                          )
13   VAZGEN TOPADZHIKYAN,                       )
          aka "Lucky,"                         )
14   ARA FERMANYAN,                             )
          aka "Casper,"                        )
15        aka "Cass,"                          )
     DAVID MURADYAN,                            )
16        aka "Stranger,"                      )
          aka "Davo,"                          )
17   KAREN MARKOSIAN,                           )
          aka "Kar,"                           )
18        aka "Garen,"                         )
     KAREN ZAKARYAN,                            )
19        aka "Kond,"                          )
          aka "Gond,"                          )
20        aka "Kondik,"                        )
          aka "Kar,"                           )
21   ARTUR PEMBEJIAN,                           )
          aka "Cham,"                          )
22   ARAM PETROSIAN,                            )
          aka "Tot,"                           )
23        aka "Toto,"                          )
     ARMAN KARAYAN,                             )
24   OGANES TEROGANESYAN,                       )
          aka "Hovo,"                          )
25        aka "Hovik,"                         )
          aka "Oganes Terognesyan,"            )
26   JACK GAMBARYAN,                            )
          aka "Zhak Gambarian,"                )
27        aka "Speedy,"                        )
     RAYMOND TARVERDYAN,                        )
28        aka "Rye,"                           )
          aka "Ray,"                           )
```

```
 1   VAHE MNATSAKANYAN,                     )
        aka "V,"                            )
 2      aka "Vahik,"                        )
     ARMANDO MORENO,                        )
 3      aka "Mando,"                        )
        aka "Monkey,"                       )
 4      aka "Blackie,"                      )
     ANDRANIK ALOYAN,                       )
 5      aka "Andy,"                         )
        aka "Ando,"                         )
 6   LUSINE OGANDGANYAN,                     )
        aka "Lusine Ogandjanian,"           )
 7      aka "Luso,"                         )
     GUSTAVO ORTEGA,                        )
 8      aka "Bam Bam,"                      )
        aka "Bams,"                         )
 9      aka "Gus,"                          )
     GAGIK ZHAMKOCHYAN,                     )
10      aka "Manic,"                        )
        aka "Panther,"                      )
11      aka "Gago,"                         )
        aka "Gag,"                          )
12   SUREN TOROSYAN,                        )
        aka "Suro,"                         )
13      aka "Sunny,"                        )
     GRACHIA NALBANDYAN,                    )
14      aka "Raider,"                       )
        aka "Puffy,"                        )
15      aka "Crazy,"                        )
     EDGAR YERKANYAN,                       )
16      aka "Edo,"                          )
     KARINE MKRTCHYAN,                      )
17   RAFAEL PARSADANYAN,                    )
        aka "Raffi,"                        )
18      aka "Raffo,"                        )
     SIMON ANTONYAN,                        )
19      aka "Simo,"                         )
        aka "Sim,"                          )
20   GAREN CHOULDJIAN,                      )
        aka "Misak,"                        )
21   GRIGOR GARIBYAN,                       )
        aka "Gokor,"                        )
22   ARTUR GABRELYAN,                       )
        aka "Rubo,"                         )
23      aka "Art,"                          )
     ANDRANIK BAKHCHADJIAN,                 )
24      aka "Ando,"                         )
        aka "Andranik Bakhcadjian,")
25   VARTENIE ANANIAN,                      )
     RAFAEL GONZALEZ-MUNOZ JR.,             )
26      aka "Cisco,"                        )
        aka "the Drink,"                    )
27   KHACHATUR ARAKELYAN,                   )
        aka "Khecho,"                       )
28   KARAPET JOEY KARAMUSYAN,               )
        aka "Karo,"                         )
```

```
 1 │ HAROUTIOUN ARTHUR MELKONIAN,  )
   │    aka "Art,"                  )
 2 │    aka "Art from Montebello,"  )
   │ ARSEN AYRANJIAN,               )
 3 │ ADAM DAVOODIAN,                )
   │    aka "Aram,"                 )
 4 │ ARAM KHACHATRYAN,              )
   │ TIGRAN SARKISYAN,              )
 5 │    aka "Tiko,"                 )
   │ MIGUEL AGUSTIN RAMIREZ,        )
 6 │    aka "Mugsy,"                )
   │    aka "Mugs,"                 )
 7 │ HAGOP YAMALYAN,                )
   │    aka "Hago,"                 )
 8 │ MANUK TERZYAN,                 )
   │    aka "Max,"                  )
 9 │ KAREN HESHAM SAMAWI,           )
   │    aka "Karen Hesham,"         )
10 │ JULIO CESAR RIVAS,             )
   │    aka "July,"                 )
11 │    aka "Biggie,"               )
   │    aka "Big Boy,"              )
12 │ ZHIRAYR KARAYAN,               )
   │    aka "Zhiro,"                )
13 │    aka "Jerry,"                )
   │ SARKIS AVEDISIAN,              )
14 │    aka "Sako,"                 )
   │ VARTAN AVEDISSIAN,             )
15 │    aka "Vardan,"               )
   │    aka "Voicebox,"             )
16 │ JOSEPH MARES,                  )
   │ CATRINA BALDERRAMA,            )
17 │ VARDAN AMIRKHANYAN,            )
   │ HOVANNES IGARIAN,              )
18 │    aka "Hovo,"                 )
   │ NAIRA ASTGHIK TEROUNIAN,       )
19 │ ARNOLD MORADIANS,              )
   │    aka "Arno,"                 )
20 │ DEBRA MAY-LAWSON,              )
   │    aka "Sugar,"                )
21 │ RAFAEL ROGER ZENDEJAS,         )
   │ STEVEN WILSON,                 )
22 │    aka "Stutters,"             )
   │ GEVORK KASABYAN,               )
23 │    aka "Kash,"                 )
   │ MARAT SHAKHRAMANYAN,           )
24 │ FNU LNU,                       )
   │    aka "Musho," and            )
25 │ FNU LNU,                       )
   │    aka "David Petrosov,"       )
26 │                               )
   │                Defendants.    )
27 │ ──────────────────────────────)
```

The Grand Jury charges:

<u>GENERAL ALLEGATIONS AND DEFINITIONS</u>

At all times relevant to this Indictment, the following definitions apply:

1.   As used in this Indictment, "personal identifying information" means any name, address, date of birth, social security number, mother's maiden name, access code, driver's license number, personal identification number ("PIN"), telephone number, signature, and other means of identification commonly provided by an individual in connection with obtaining access to a bank account.

2.   As used in this Indictment, "access device" means any card, plate, code, account number, electronic serial number, mobile identification number, PIN, or other telecommunications service, equipment, or instrument identifier, or other means of account access that can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds, as more fully defined in Title 18, United States Code, Section 1029(e).

3.   As used in this Indictment, "counterfeit access device" means any access device that is counterfeit, fictitious, altered, or forged, or an identifiable component of an access device or a counterfeit access device, as more fully defined in Title 18, United States Code, Section 1029(e).

4.   As used in this Indictment, "unauthorized access device" means any access device that is lost, stolen, expired, revoked, cancelled, or obtained with intent to defraud, as more fully defined in Title 18, United States Code, Section 1029(e).

5.   As used in this Indictment, "device-making equipment" means any equipment, mechanism, or impression designed or primarily used for making an access device or a counterfeit access device, as more fully defined in Title 18, United States Code, Section 1029(e).

6.   As used in this Indictment, a "skimming device" is a device that can be attached to a debit or credit card keypad or a point-of-sale terminal to record the information, including account numbers, from the magnetic strips of cards that are swiped into the keypad.  A skimming device will also record the key strokes entered into the keypad, including pin numbers and access codes corresponding to the cards.  The information recovered from a skimming device can then be used to create counterfeit and unauthorized access devices, thereby allowing money to be withdrawn from an account holder's bank account without the account holder's consent, knowledge, or authorization.

7.   As used in this Indictment, "identification document" means a document made or issued by or under the authority of the United States Government, a State, a political subdivision of a State, a sponsoring entity of an event designated as a special event of national significance, a foreign government, a political subdivision of a foreign government, an international governmental or an international quasi-governmental organization

which, when completed with information concerning a particular
individual, is of a type intended or commonly accepted for the
purpose of identification of individuals, as more fully defined
in Title 18, United States Code, Section 1028(d).

8.   As used in this Indictment, "false identification
document" means a document of a type intended or commonly
accepted for the purposes of identification of individuals that
(a) is not issued by or under the authority of a governmental
entity, or was issued under the authority of a governmental
entity but was subsequently altered for purposes of deceit; and
(b) appears to be issued by or under the authority of the United
States Government, a State, a political subdivision of a State, a
sponsoring entity of an event designated by the President as a
special event of national significance, a foreign government, a
political subdivision of a foreign government, or an
international governmental or quasi-governmental organization, as
more fully defined in Title 18, United States Code, Section
1028(d).

9.   As used in this Indictment, "means of identification"
means any name or number that may be used, alone or in
conjunction with any other information, to identify a specific
individual, including, among other things, (a) any name, social
security number, date of birth, official State or government
issued driver's license or identification number, alien
registration number, government passport number, employer or
taxpayer identification number; or (b) unique electronic

identification number, address, or routing code, including a PIN, as more fully defined in Title 18, United States Code, Section 1028(d).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COUNT ONE

[18 U.S.C. § 1962(d)]

THE RACKETEERING ENTERPRISE

1.    At all times relevant to this Indictment, defendants
MHER DARBINYAN, also known as ("aka") "Mike," aka "Hollywood
Mike," aka "Little Mike," aka "Capone," aka "Caps," aka "Maher"
("DARBINYAN"); PARAMAZ BILEZIKCHYAN, aka "Parik," aka "P," aka
"Parnamas Bileziktsian," aka "Bleziktsian Paramas"
("BILEZIKCHYAN"); KARO YERKANYAN, aka "Guilty," aka "Gator," aka
"Kane" ("K. YERKANYAN"); ARMAN SHAROPETROSIAN, aka "Horse," aka
"Dzi" ("SHAROPETROSIAN"); HAYK KARAYAN, aka "Hayko," aka
"Whisper" ("H. KARAYAN"); ARMAN TANGABEKYAN, aka "Spito," aka
"Spitak," aka "Villager," aka "Thick Neck," aka "Armancho"
("TANGABEKYAN"); EMIL AIRAPETIAN, aka "Clever," aka "Emo"
("AIRAPETIAN"); ARMEN HOVANISSIAN, aka "Sniper," aka "Arm"
("HOVANISSIAN"); ROMAN TEROGANESYAN, aka "Lil Boy," aka "Rome,"
aka "Roman Teroganesian," aka "Arthur Teroganesian" ("R.
TEROGANESYAN"); EDGAR KHACHATRYAN, aka "Gunner," aka "Lil
Gunner," aka "Edo" ("E. KHACHATRYAN"); GARIK GALSTYAN, aka
"Stomper," aka "Stomps" ("GALSTYAN"); HARUT TOROSYAN, aka
"Menace," aka "Harout Torosyan" ("H. TOROSYAN"); SOUREN SEROBYAN,
aka "Suro" ("SEROBYAN"); VAZGEN TOPADZHIKYAN, aka "Lucky"
("TOPADZHIKYAN"); ARA FERMANYAN, aka "Casper," aka "Cass"
("FERMANYAN"); DAVID MURADYAN, aka "Stranger," aka "Davo"
("MURADYAN"); KAREN MARKOSIAN, aka "Kar," aka "Garen"
("MARKOSIAN"); KAREN ZAKARYAN, aka "Kond," aka "Gond," aka
"Kondik," aka "Kar" ("ZAKARYAN"); ARTUR PEMBEJIAN, aka "Cham"
("PEMBEJIAN"); ARAM PETROSIAN, aka "Tot," aka "Toto"

1  ("PETROSIAN"); ARMAN KARAYAN ("A. KARAYAN"); OGANES TEROGANESYAN,

2  aka "Hovo," aka "Hovik," aka "Oganes Terognesyan" ("O.

3  TEROGANESYAN"); JACK GAMBARYAN, aka "Zhak Gambarian," aka

4  "Speedy" ("GAMBARYAN"); RAYMOND TARVERDYAN, aka "Rye," aka "Ray"

5  ("TARVERDYAN"); VAHE MNATSAKANYAN, aka "V," aka "Vahik"

6  ("MNATSAKANYAN"); ARMANDO MORENO, aka "Mando," aka "Monkey," aka

7  "Blackie" ("MORENO"); ANDRANIK ALOYAN, aka "Andy," aka "Ando"

8  ("ALOYAN"); LUSINE OGANDGANYAN, aka "Lusine Ogandjanian," aka

9  "Luso" ("L. OGANDGANYAN"); and GUSTAVO ORTEGA, aka "Bam Bam," aka

10  "Bams," aka "Gus" ("ORTEGA"), and others known and unknown to the

11  Grand Jury, were members and associates of the Armenian Power

12  criminal organization ("Armenian Power"), whose members and

13  associates engaged in, among other things, murder, attempted

14  murder, kidnapping, robbery, extortion, conspiracy to traffic in

15  controlled substances, bank fraud, access device fraud, identity

16  theft, and illegal gambling.  At all relevant times to this

17  Indictment, the Armenian Power criminal organization operated

18  within the Central District of California and elsewhere.

19      2.   Armenian Power, including its leadership, members, and

20  associates, constitutes an "enterprise," as that term is defined

21  in Title 18, United States Code, Section 1961(4) -- that is, a

22  group of individuals associated in fact, although not a legal

23  entity, which is engaged in, and the activities of which affect,

24  interstate and foreign commerce.  Armenian Power is an

25  international organized crime group, with its leadership based in

26  Los Angeles, that operates throughout the United States,

27  including the Central District of California, and

28  internationally.  The enterprise constitutes an ongoing

1  organization whose members function as a continuing unit for a
2  common purpose of achieving the objectives of the enterprise.
3      3.   Armenian Power, or "AP" as it is commonly referred to
4  by its members and associates, originated in Los Angeles County
5  in the 1980s.  Armenian Power was formed in the East Hollywood
6  district of Los Angeles as a street gang whose membership
7  consisted primarily of individuals of Armenian descent, as well
8  as of other countries within the former Soviet bloc, in response
9  to other ethnic street gangs in the area.  From its inception,
10 members and associates of Armenian Power have been involved in
11 various violent criminal acts, including murders, attempted
12 murders, kidnappings, robberies, extortions, and witness
13 intimidation, as well as drug trafficking and crimes involving
14 fraudulent activity.
15     4.   Today, Armenian Power has been designated under
16 California state law as a criminal street gang and is believed to
17 have over 250 documented members, as well as hundreds of
18 associates.  Armenian Power members and associates generally
19 frequent locations and businesses in Los Angeles County,
20 including the district of Hollywood, and the cities of Glendale,
21 Burbank, North Hollywood, West Hollywood, and Van Nuys.  Control
22 of territory within these areas, however, is not as important to
23 Armenian Power members and associates as maintaining "hang outs"
24 to plan and commit crimes and further Armenian Power's purpose of
25 enriching its members and associates.  Armenian Power members and
26 associates typically use "hang outs" that are owned or operated
27 by people who permit Armenian Power members and associates to use
28

1    such locations due to fear, intimidation, or association with
2    Armenian Power.

3        5.    Members of Armenian Power generally join the
4    organization after spending a period of time as associates of the
5    organization, during which time they are expected to put in
6    "work," in other words, commit violent acts, carry firearms, and
7    otherwise assist more senior Armenian Power members in committing
8    crimes.   Members normally join Armenian Power by being "jumped
9    in," in other words, by being beaten by other Armenian Power
10   members for a short period of time, or by being "walked in," in
11   other words, by being vouched for or sponsored by a member of
12   Armenian Power.   Armenian Power gang members typically identify
13   themselves through use of gang tattoos, tagging or graffiti, gang
14   signs, gang art, street names or monikers, and gang clothing.

15       6.    Leadership and power within Armenian Power is generally
16   based on a combination of seniority and notoriety for committing
17   criminal acts.   Members of Armenian Power who have spent extended
18   sentences in jail or prison and who have developed relationships
19   with members of powerful prison gangs generally carry more power
20   and status within the gang.   Also, members who are known to have
21   committed acts of violence against others tend to wield more
22   power and authority within Armenian Power.   At times, there have
23   been disputes and rivalries between members and associates of
24   Armenian Power regarding power, authority, and leadership within
25   the criminal enterprise, but members and associates of Armenian
26   Power nonetheless generally act in concert to oppose rival
27   criminal organizations and individuals.

28

12

1    7.   To enrich its members and associates, and preserve,
2  protect, enhance, and expand the power of the Armenian Power
3  criminal enterprise, Armenian Power members and associates
4  regularly carry out violent criminal acts, including murders,
5  attempted murders, kidnappings, robberies, extortions, and
6  witness intimidation.  In order to carry out violent criminal
7  acts, eliminate rivals, intimidate and threaten others, and
8  promote the overall power and criminal reputation of the Armenian
9  Power criminal enterprise, Armenian Power members and associates
10  acquire and maintain firearms, ammunition, and other weapons, and
11  distribute firearms, ammunition, and other weapons to Armenian
12  Power members and associates.

13    8.   Because one of the purposes of the Armenian Power
14  criminal enterprise is to enrich its members and associates,
15  Armenian Power members and associates engage in a wide variety of
16  crimes intended to unlawfully generate revenue, including
17  kidnappings, robberies, extortions, drug trafficking, bank fraud,
18  access device fraud, identity theft, and illegal gambling.  In
19  order to effectively commit these crimes, Armenian Power members
20  rely extensively on a wide network of associates to assist in
21  carrying out their crimes.  For instance, with regard to bank
22  fraud, Armenian Power relies on members and associates with the
23  knowledge and ability to unlawfully obtain bank customer
24  information, forge checks, and recruit check cashing "runners" to
25  illegally cash or deposit checks.  Further, with regard to access
26  device fraud, Armenian Power relies on members and associates
27  with the knowledge and ability to create fraudulent debit cards
28  and credit cards.  Armenian Power's network of associates is an

1  important part of its ability to successfully carry out a wide-
2  array of criminal activities.  In carrying out fraud crimes,
3  members and associates of Armenian Power use, control, and
4  possess personal identifying information, access devices,
5  unauthorized access devices, counterfeit access devices, device-
6  making equipment, including skimming devices, identification
7  documents, false identification documents, and means of
8  identification, among other things.

9      9.  Armenian Power is closely associated with an
10  organization known as the "Mexican Mafia," or "EME," which is
11  Spanish for the letter "M."  As such, Armenian Power is sometimes
12  referred to as "AP-13," with the number "13" representing the
13  thirteenth letter of the alphabet, the letter "M."  The Mexican
14  Mafia is an organized group of individuals that controls much of
15  the distribution of narcotics and other criminal activities
16  within California state prisons and some federal prisons.  The
17  relationship between Armenian Power and the Mexican Mafia is
18  symbiotic:  The Mexican Mafia, which has large numbers of
19  incarcerated members and associates, provides protection and
20  status to Armenian Power members and associates within prison.
21  In exchange, Armenian Power members and associates assist Mexican
22  Mafia members and associates with collecting money or "taxes"
23  within prison and outside prison, smuggling contraband, including
24  narcotics, into prison, and committing financial and fraud-
25  related crimes outside of prison.  In addition, Armenian Power
26  members and associates and Mexican Mafia members and associates
27  tend to exchange high-value gifts, including vehicles and
28  weapons.

10.   Due in part to their prior periods of incarceration --
for robbery, assault with a deadly weapon, financial fraud, and
other offenses -- and other connections, defendants DARBINYAN,
BILEZIKCHYAN, K. YERKANYAN, HOVANISSIAN, R. TEROGANESYAN, and
other members and associates of Armenian Power have forged
particularly strong ties to leaders and members of the Mexican
Mafia, and they are able to regularly access and communicate with
Mexican Mafia leaders.   These strong ties to the Mexican Mafia,
as well as their seniority and lengthy experience in committing
violent criminal acts, gave defendants DARBINYAN, BILEZIKCHYAN,
K. YERKANYAN, HOVANISSIAN, R. TEROGANESYAN, as well as others
with close ties to them, an important leadership role in Armenian
Power.

11.   Particularly through its leadership, Armenian Power
maintains ties to Russia and Armenia, to which most members and
associates generally retain strong ethnic and cultural ties.
Indeed, although most are fluent in English, Armenian Power
members and associates generally prefer to discuss their criminal
activities in the Armenian and Russian languages in order to
conceal their discussions to the extent possible.   Traditionally,
Russian and Armenian organized crime centers on criminal elders
and high-level crime bosses, such as a "Thief-in-Law," or, in
Armenian, "Gogh."   These "Thieves-in-Law" typically use their
authority within Russian and Armenian organized crime to resolve
disputes among criminals and others, authorize criminal activity,
and receive payments or tribute from organized crime members and
others.

1    12.   Within Los Angeles and elsewhere, the leadership of
2   Armenian Power, including, among others, defendants DARBINYAN,
3   BILEZIKCHYAN, K. YERKANYAN, SHAROPETROSIAN, H. KARAYAN,
4   TANGABEKYAN, HOVANISSIAN, and R. TEROGANESYAN, operates as
5   equivalent to a "Thief-in-Law."  Armenian Power leaders authorize
6   and carry out violent acts and large-scale criminal activity,
7   wield power and authority among Armenian organized crime figures
8   and others in the broader Armenian and Eurasian communities,
9   maintain ties with the Mexican Mafia and other non-Armenian
10  criminal groups, and often communicate with high-level Armenian
11  and Russian organized crime figures, both abroad and in the
12  United States.  The leadership of Armenian Power deals directly
13  with traditional "Thieves-in-Law" and other high-level organized
14  crime figures, both within the United States and abroad, in order
15  to resolve criminal disputes and address criminal activities.
16  Because of their large network of members and associates,
17  demonstrated ability to carry out acts of violence, and strong
18  relationship with the Mexican Mafia, Armenian Power leaders
19  interact with traditional "Thieves-in-Law" as co-equals.
20  Moreover, at times, Armenian Power members and associates
21  confront and commit acts of violence against associates of
22  traditional "Thieves-in-Law," and often disregard their criminal
23  authority in favor of the criminal authority of the Armenian
24  Power leadership.

25                    PURPOSES OF THE ENTERPRISE

26    13.   The purposes of the Armenian Power criminal enterprise,
27  including its members and associates, include, but are not
28  limited to, the following:

1          a.   Enriching members and associates of the Armenian

2   Power criminal enterprise through, among other things,

3   kidnapping, robbery, extortion, narcotics distribution, illegal

4   gambling, access device fraud, bank fraud, and other crimes;

5          b.   Preserving and expanding the power and financial

6   profits of the Armenian Power criminal enterprise through

7   intimidation, threats of violence, and actual acts of violence;

8          c.   Promoting, protecting, and enhancing the Armenian

9   Power criminal enterprise and the activities of its members and

10   associates.

### MEANS AND METHODS OF THE ENTERPRISE

12     14.   Among the means and methods by which defendants and

13   other members and associates of the Armenian Power criminal

14   enterprise participate in the conduct of the affairs of the

15   Armenian Power criminal enterprise are the following:

16          a.   Members and associates of the Armenian Power

17   criminal enterprise commit, attempt to commit, and conspire to

18   commit acts of violence, including murder, kidnapping, robbery,

19   and extortion, to preserve and expand the power and financial

20   profits of the Armenian Power criminal enterprise.

21          b.   Members and associates of the Armenian Power

22   criminal enterprise use violence and the threat of violence to

23   preserve and enhance the power and financial profits of members

24   and associates of the Armenian Power criminal enterprise.

25          c.   Members and associates of the Armenian Power

26   criminal enterprise and their co-conspirators work together on a

27   wide-range of money-making schemes, including, among other

28   things, bank fraud, access device fraud, identity theft,

1   distribution of controlled substances, and illegal gambling, in

2   order to generate criminal proceeds and income for members and

3   associates of the Armenian Power criminal enterprise and their

4   co-conspirators.

5        d.   Members and associates of the Armenian Power

6   criminal enterprise build, maintain, and preserve ties with

7   Mexican Mafia members and associates in order to protect Armenian

8   Power members and associates who are incarcerated, and to

9   promote, protect, and enhance the power and reputation of the

10  Armenian Power criminal enterprise.

11            THE RACKETEERING CONSPIRACY

12       15.  Beginning on a date unknown to the Grand Jury, and

13  continuing to in or around January 2011, in Los Angeles County,

14  within the Central District of California, and elsewhere,

15  defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN, SHAROPETROSIAN,

16  H. KARAYAN, TANGABEKYAN, AIRAPETIAN, HOVANISSIAN, R.

17  TEROGANESYAN, E. KHACHATRYAN, GALSTYAN, H. TOROSYAN, SEROBYAN,

18  TOPADZHIKYAN, FERMANYAN, MURADYAN, MARKOSIAN, ZAKARYAN,

19  PEMBEJIAN, PETROSIAN, A. KARAYAN, O. TEROGANESYAN, GAMBARYAN,

20  TARVERDYAN, MNATSAKANYAN, MORENO, ALOYAN, L. OGANDGANYAN, and

21  ORTEGA, and others known and unknown to the Grand Jury, being

22  persons employed by and associated with the Armenian Power

23  criminal enterprise described in Paragraphs One through Twelve of

24  this Count, which constitutes an "enterprise" as defined in Title

25  18, United States Code, Section 1961(4), which enterprise engaged

26  in, and the activities of which affected, interstate and foreign

27  commerce, unlawfully and knowingly combined, conspired,

28  confederated, and agreed together and with each other to violate

18

Title 18, United States Code, Section 1962(c), that is, to
conduct and participate, directly and indirectly, in the conduct
of the affairs of the enterprise through a pattern of
racketeering activity, as that term is defined in Title 18,
United States Code, Sections 1961(1) and 1961(5), consisting of
multiple acts indictable under:

A.    Title 18, United States Code, Section 1028 (Identity
Theft);

B.    Title 18, United States Code, Section 1029 (Access
Device Fraud);

C.    Title 18, United States Code, Section 1344 (Bank
Fraud);

D.    Title 18, United States Code, Section 1951
(Interference with Commerce by Threats or Violence);

E.    Title 18, United States Code, Section 1955 (Prohibition
of Illegal Gambling Businesses);

and multiple acts involving:

A.    Extortion, in violation of California Penal Code
Sections 32, 182, 518-520, and 664;

B.    Kidnapping, in violation of California Penal Code
Sections 32, 182, 207-210, and 664;

C.    Robbery, in violation of California Penal Code Sections
32, 182, 211, and 664;

and multiple acts involving the manufacture, distribution,
and possession with intent to distribute controlled substances,
in violation of Title 21, United States Code, Sections 846 and
841(a)(1).

It was a part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering activity in the conduct of the affairs of the Enterprise.

A. **MEANS BY WHICH THE OBJECT OF THE CONSPIRACY WAS TO BE ACCOMPLISHED**

The object of the conspiracy was to be accomplished in substance as follows:

1. Defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN, SHAROPETROSIAN, and H. KARAYAN, and others would direct and coordinate the activities of the Armenian Power criminal enterprise, including its members and associates, insofar as those activities included the commission of crimes of violence, including kidnapping and extortion, and fraud-related crimes, including bank fraud and access device fraud.

2. Defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN, SHAROPETROSIAN, H. KARAYAN, TANGABEKYAN, AIRAPETIAN, HOVANISSIAN, R. TEROGANESYAN, E. KHACHATRYAN, GALSTYAN, H. TOROSYAN, FERMANYAN, MURADYAN, MARKOSIAN, ZAKARYAN, PEMBEJIAN, PETROSIAN, O. TEROGANESYAN, GAMBARYAN, and L. OGANDGANYAN, and others would carry out crimes of violence, including kidnapping and extortion, to preserve and expand the power and financial profits of the Armenian Power criminal enterprise.

3. Defendants DARBINYAN, BILEZIKCHYAN, and SHAROPETROSIAN, who was incarcerated in California State Prison at times during the conspiracy, would direct other members and associates of the Armenian Power criminal enterprise to execute and attempt to execute bank fraud schemes targeting the bank accounts of unwitting victims. In particular, defendants DARBINYAN,

1  BILEZIKCHYAN, and SHAROPETROSIAN would direct their co-schemers,

2  including defendants TANGABEKYAN, MARKOSIAN, MNATSAKANYAN,

3  MORENO, ALOYAN, L. OGANDGANYAN, ORTEGA, and Karen Hesham Samawi

4  ("Samawi"), to, among other things, obtain, unlawfully and

5  without authorization, (a) bank account information for high-

6  value bank accounts; (b) personal identifying information for the

7  bank customer victims who owned the high-value bank accounts,

8  including names, social security numbers, and dates of birth; and

9  (c) checks for the high-value bank accounts.  The co-schemers

10  would then create fraudulent checks with forged signatures and

11  direct other co-schemers to go to different bank branches to cash

12  and deposit the fraudulent checks.  In this regard, defendants

13  and their co-schemers would often rely on "check runners," whose

14  function was to enter a bank and attempt to cash or deposit a

15  fraudulent check in exchange for a promised fee.  Additionally,

16  defendant DARBINYAN would work with other co-schemers, including

17  defendants PETROSIAN, TARVERDYAN, and ORTEGA, to unlawfully

18  obtain debit card numbers from bank fraud victims using skimming

19  devices installed at stores, and then direct "runners" to

20  unlawfully and without authorization use the debit card numbers

21  to withdraw money from the victims' bank accounts.  Further,

22  defendants BILEZIKCHYAN, K. YERKANYAN, and ALOYAN, and others

23  would use personal identifying information of bank fraud victims

24  to unlawfully and without authorization open bank accounts in the

25  names of the bank fraud victims in order to obtain money from,

26  among other things, fraudulent loans and lines of credit.

27      4.   Defendants DARBINYAN, BILEZIKCHYAN, H. KARAYAN, H.

28  TOROSYAN, SEROBYAN, TOPADZHIKYAN, PETROSIAN, TARVERDYAN, ALOYAN,

1  and ORTEGA, and others often by using skimming devices, would

2  obtain, and direct others to obtain, access devices from

3  unwitting victims, with intent to defraud, and in order to create

4  counterfeit or unauthorized access devices.

5      5.  Defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN,

6  SHAROPETROSIAN, H. KARAYAN, HOVANISSIAN, R. TEROGANESYAN,

7  FERMANYAN, A. KARAYAN, O. TEROGANESYAN, GAMBARYAN, TARVERDYAN,

8  and MNATSAKANYAN, and others would manufacture, distribute, and

9  possess with intent to distribute controlled substances.

10      6.  Defendants BILEZIKCHYAN, H. KARAYAN, R. TEROGANESYAN,

11  and GAMBARYAN, and others would conduct, finance, manage,

12  supervise, direct, and own all or part of illegal gambling

13  businesses.

14      7.  Defendants DARBINYAN, BILEZIKCHYAN, and K. YERKANYAN,

15  and others would meet with defendants MORENO and Rafael Gonzalez-

16  Munoz Jr. ("Gonzalez-Munoz Jr."), and other Mexican Mafia members

17  and associates, to discuss relations between the Mexican Mafia

18  and members and associates of the Armenian Power criminal

19  enterprise, and defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN,

20  and SHAROPETROSIAN, and others, would provide Mexican Mafia

21  members and associates with money, drugs, and other contraband,

22  as well as direction on committing fraud-related crimes, in order

23  to preserve and enhance the Armenian Power criminal enterprise's

24  relationship with the Mexican Mafia.

25      8.  Defendants DARBINYAN, BILEZIKCHYAN, and K. YERKANYAN,

26  and others would regularly meet with Thieves-in-Law for purposes

27  of addressing disputes among criminal figures and others within

28  the Armenian and Eurasian communities.  DARBINYAN, BILEZIKCHYAN,

1  and K. YERKANYAN, and others would also confront and challenge

2  Thieves-in-Law and their associates with regard to criminal

3  disputes and the Armenian Power criminal enterprise's asserted

4  control of criminal activities involving the Armenian and

5  Eurasian communities within Los Angeles and elsewhere.

6       9.    Defendants DARBINYAN, BILEZIKCHYAN, K. YERKANYAN,

7  SHAROPETROSIAN, H. KARAYAN, HOVANISSIAN, R. TEROGANESYAN, E.

8  KHACHATRYAN, GALSTYAN, H. TOROSYAN, SEROBYAN, FERMANYAN,

9  MURADYAN, MARKOSIAN, ZAKARYAN, PEMBEJIAN, PETROSIAN, TARVERDYAN,

10  and ALOYAN, and others would obtain, use, and possess firearms

11  and ammunition to commit crimes of violence and in order to

12  preserve and enhance the Armenian Power criminal enterprise.

13  B.    OVERT ACTS

14      In furtherance of the racketeering conspiracy, and to

15  accomplish the objects of the racketeering conspiracy, defendants

16  DARBINYAN, BILEZIKCHYAN, K. YERKANYAN, SHAROPETROSIAN, H.

17  KARAYAN, TANGABEKYAN, AIRAPETIAN, HOVANISSIAN, R. TEROGANESYAN,

18  E. KHACHATRYAN, GALSTYAN, H. TOROSYAN, SEROBYAN, TOPADZHIKYAN,

19  FERMANYAN, MURADYAN, MARKOSIAN, ZAKARYAN, PEMBEJIAN, PETROSIAN,

20  A. KARAYAN, O. TEROGANESYAN, GAMBARYAN, TARVERDYAN, MNATSAKANYAN,

21  MORENO, ALOYAN, L. OGANDGANYAN, and ORTEGA, and others known and

22  unknown to the Grand Jury, committed and caused to be committed

23  various overt acts, on or about the following dates, within the

24  Central District of California, and elsewhere, including, but not

25  limited to, the following:

26      Conspiracy to Extort Victim S.M.

27      1.    On or about January 9, 2009, defendant K. YERKANYAN,

28  in a telephone conversation using coded language, discussed with

1 defendant HOVANISSIAN, who was incarcerated at the time, a plan

2 to force another jail inmate, victim S.M., to pay them money.

3     2.    On or about January 9, 2009, defendant HOVANISSIAN,

4 in a telephone conversation using coded language, told defendant

5 K. YERKANYAN to call victim S.M. and threaten that HOVANISSIAN

6 would distribute compromising photographs of victim S.M. to other

7 jail inmates unless he paid them money.

8     3.    On or about January 10, 2009, defendant K. YERKANYAN,

9 in a telephone conversation using coded language, told defendant

10 HOVANISSIAN that K. YERKANYAN wanted to visit victim S.M. in jail

11 in order to extort him using the compromising photographs, and

12 HOVANISSIAN said he would send K. YERKANYAN victim S.M.'s

13 information to facilitate this visit.

14     <u>Extortion of Victim M.M.</u>

15     4.    On or about June 27, 2009, defendant SHAROPETROSIAN,

16 in a telephone conversation using coded language, discussed with

17 defendant DARBINYAN seizing and holding victim M.M. until victim

18 M.M.'s father brought them money.

19     5.    On or about June 29, 2009, defendant SHAROPETROSIAN

20 initiated a three-way call with defendant DARBINYAN and victim

21 M.M. and threatened victim M.M. with bodily harm if he did not

22 pay money to SHAROPETROSIAN and DARBINYAN.

23     6.    On or about June 30, 2009, defendant DARBINYAN, in a

24 telephone conversation using coded language, told defendant

25 SHAROPETROSIAN that DARBINYAN had met with victim M.M. and

26 threatened him with physical violence if he did not pay money,

27 and SHAROPETROSIAN said victim M.M. should pay $70,000 to

28 defendant L. OGANDGANYAN and additional money to them.

7.    On or about July 3, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told defendant DARBINYAN to threaten victim M.M. with physical harm if victim M.M. did not pay money to SHAROPETROSIAN and DARBINYAN.

8.    On or about July 4, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told defendant DARBINYAN to inform victim M.M. that victim M.M. would be kidnapped for three months if he did not pay money to SHAROPETROSIAN.

9.    On or about July 4, 2009, defendant SHAROPETROSIAN initiated a three-way call with defendant DARBINYAN and victim M.M., and SHAROPETROSIAN and DARBINYAN told victim M.M. that they would kidnap victim M.M. if victim M.M. and his family did not pay money to SHAROPETROSIAN, DARBINYAN, and defendant L. OGANDGANYAN.

10.    On or about July 6, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with defendant DARBINYAN how much money they intended to obtain from victim M.M. that day using threats of physical harm.

11.    On or about July 6, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told victim M.M. that DARBINYAN would hurt victim M.M. if victim M.M. did not pay him money.

12.    On July 8, 2009, defendant DARBINYAN, in a telephone conversation using coded language, demanded money from victim M.M.

13.    On July 9, 2009, defendants DARBINYAN and SHAROPETROSIAN, in a telephone conversation using coded language,

1 | discussed how to obtain money from victim M.M., and
2 | SHAROPETROSIAN said that some of the money would go to defendant
3 | L. OGANDGANYAN.

4 |     14.   On August 30, 2009, defendant SHAROPETROSIAN, using
5 | coded language on the telephone, demanded money from victim M.M.

6 |     15.   On or about August 31, 2009, defendant
7 | SHAROPETROSIAN, in a telephone conversation using coded language,
8 | instructed victim M.M. to meet an unindicted co-conspirator to
9 | deliver money to her under threat of physical harm.

10 |     16.   On or about September 3, 2009, defendant
11 | SHAROPETROSIAN, in a telephone conversation using coded language,
12 | demanded $100,000 from victim M.M. under threat of physical harm.

13 |     17.   On or about September 4, 2009, defendant
14 | SHAROPETROSIAN, in a telephone conversation using coded language,
15 | told victim M.M. that victim M.M. would be killed.

16 |     18.   On or about September 11, 2009, defendants
17 | SHAROPETROSIAN and L. OGANDGANYAN spoke with victim M.M. in a
18 | three-way call and, using coded language, demanded money from
19 | victim M.M. under threat of physical harm.

20 |     19.   On or about October 28, 2009, defendant
21 | SHAROPETROSIAN, in a telephone conversation using coded language,
22 | instructed victim M.M. to make deposits into certain bank
23 | accounts and to use either Western Union or Moneygram to send
24 | money to SHAROPETROSIAN and his co-conspirators under threat of
25 | violence.

20.   On or about October 29, 2009, defendants SHAROPETROSIAN and AIRAPETIAN, in a telephone conversation using coded language, demanded $1,875 from victim M.M. and threatened victim M.M. with violence if victim M.M. did not pay the money.

21.   On or about October 29, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, arranged a meeting with victim M.M. for the purpose of obtaining money from victim M.M., and, later that day, obtained approximately $1,900 from victim M.M. under threat of physical harm.

22.   On or about October 29, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, demanded $10,000 from victim M.M. and threatened to disfigure victim M.M. if he did not pay.

23.   On or about October 30, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, instructed victim M.M. to make deposits into particular bank accounts under threat of physical harm.

24.   On October 31, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded $2,000 from victim M.M.

25.   On or about November 1, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded $10,000 from victim M.M.

26.   On or about November 2, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded that victim M.M. take $1,000 to an unindicted co-conspirator that night.

27.    On or about November 2, 2009, victim M.M. paid $500 to the unindicted co-conspirator.

28.    On or about November 2, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told victim M.M. that SHAROPETROSIAN would slaughter victim M.M. if victim M.M. did not deposit money as directed by SHAROPETROSIAN.

29.    On or about November 4, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, demanded $2,500 in cash from victim M.M. and said he would send someone over to pick up the money from victim M.M.

30.    On or about November 4, 2009, a person known to the Grand Jury picked up $2,000 from victim M.M.

31.    On or about November 6, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, asked victim M.M. whether victim M.M. had sent the money demanded by SHAROPETROSIAN under threat of physical harm using Western Union or Moneygram.

32.    On or about November 12, 2009, defendant L. OGANDGANYAN and others known and unknown to the Grand Jury met with victim M.M. and demanded money from victim M.M.

33.    On or about November 19, 2009, defendant L. OGANDGANYAN, in a telephone conversation using coded language, told victim M.M. that victim M.M. had to pay her money under threat of physical harm.

34.   On or about November 21, 2009, defendant L. OGANDGANYAN, in a telephone conversation using coded language, threatened to kill victim M.M.'s family if victim M.M. did not pay money to L. OGANDGANYAN.

<u>Conspiracy to Extort Victim L.A.</u>

35.   On or about July 9, 2009, defendants DARBINYAN and BILEZIKCHYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that DARBINYAN and BILEZIKCHYAN needed to catch victim L.A. and physically assault him, and BILEZIKCHYAN said that if they catch victim L.A., there is a lot of money to be made.

36.   On or about July 10, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant MARKOSIAN that DARBINYAN and defendant BILEZIKCHYAN wanted to find victim L.A. and that victim L.A. owed BILEZIKCHYAN approximately $7,000.

37.   On or about July 10, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that if DARBINYAN found victim L.A., they would make money.

<u>Conspiracy to Extort Victims Z and L.K.</u>

38.   On or about August 20, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ZAKARYAN that DARBINYAN and defendant K. YERKANYAN were driving to the "Chicken House" restaurant in the Hollywood district of Los Angeles, California, to confront victims Z, L.K., and others, who DARBINYAN and his associates believed owed them money, and ZAKARYAN said he would be there.

1     39.   On or about August 20, 2009, defendant DARBINYAN, in

2 a telephone conversation using coded language, told defendant

3 MARKOSIAN that DARBINYAN was on his way to Hollywood to confront

4 victims Z, L.K., and others, and MARKOSIAN said he would be

5 there.

6     40.   On or about August 20, 2009, defendant DARBINYAN, in

7 a telephone conversation using coded language, told defendant

8 PEMBEJIAN that DARBINYAN was on his way to Hollywood to confront

9 victims Z, L.K., and others.

10     41.   On or about August 20, 2009, defendant BILEZIKCHYAN,

11 in a telephone conversation using coded language, told defendant

12 DARBINYAN to fill the area of the "Chicken House" restaurant with

13 Armenian Power members and associates to intimidate and

14 physically assault victims Z, L.K., and others.

15     42.   On or about August 20, 2009, defendant DARBINYAN, in

16 a telephone conversation using coded language, told defendant

17 PEMBEJIAN that DARBINYAN and defendant K. YERKANYAN were at the

18 "Chicken House" restaurant and had some firearms but wanted more,

19 and PEMBEJIAN said he would meet DARBINYAN there.

20     43.   On or about August 20, 2009, defendant BILEZIKCHYAN,

21 in a telephone conversation using coded language, told an

22 unindicted co-conspirator that Armenian Power members and

23 associates would soon arrive at the "Chicken House" restaurant to

24 back up defendants DARBINYAN and K. YERKANYAN, and BILEZIKCHYAN

25 informed the unindicted co-conspirator that DARBINYAN and K.

26 YERKANYAN had firearms.

27     44.   On or about August 20, 2009, defendants DARBINYAN, K.

28 YERKANYAN, E. KHACHATRYAN, GALSTYAN, H. TOROSYAN, SEROBYAN,

1   FERMANYAN, MURADYAN, and ZAKARYAN, and other members and
2   associates of Armenian Power, were present at the "Chicken House"
3   restaurant while in possession of at least five firearms,
4   including a Springfield Armory model XD .45 caliber handgun, a
5   Sig Sauer model SP 2340 .40 caliber handgun, an Israel Military
6   Industries model Baby Desert Eagle .40 caliber handgun, a Heckler
7   & Koch model USP .40 caliber handgun, and a Glock model 17 9
8   millimeter caliber handgun, and numerous rounds of ammunition.

9        45.   On or about August 20, 2009, defendant GAMBARYAN, in
10  a telephone conversation using coded language, reported to
11  defendant BILEZIKCHYAN that GAMBARYAN was watching police
12  officers detaining defendants DARBINYAN and K. YERKANYAN, and
13  other members and associates of Armenian Power, at the "Chicken
14  House" restaurant.

15       46.   On or about August 20, 2009, defendant BILEZIKCHYAN,
16  in a telephone conversation using coded language, told defendant
17  GAMBARYAN that defendants DARBINYAN and K. YERKANYAN belong to
18  Armenian Power and that by going against DARBINYAN and K.
19  YERKANYAN, victims Z, L.K., and others had gone against Armenian
20  Power.

21       47.   On or about August 20, 2009, defendant BILEZIKCHYAN,
22  in a telephone conversation using coded language, told defendant
23  GAMBARYAN that BILEZIKCHYAN was going to physically assault
24  victims Z, L.K., and others for going against Armenian Power.

25       48.   On or about August 21, 2009, defendant BILEZIKCHYAN,
26  in a telephone conversation using coded language, told defendant
27  ZAKARYAN that defendants DARBINYAN and K. YERKANYAN were both
28  BILEZIKCHYAN's brothers and were members of Armenian Power, and

31

1   ZAKARYAN told BILEZIKCHYAN that he had been at the "Chicken

2   House" restaurant with other Armenian Power members and

3   associates, but was able to avoid being arrested.

4       49.   On or about August 21, 2009, defendant PEMBEJIAN, in

5   a telephone conversation using coded language, told defendant

6   DARBINYAN that he had been in the vicinity of the "Chicken House"

7   restaurant and saw police officers there, and DARBINYAN said that

8   there were many guys from Armenian Power there and that police

9   officers found multiple firearms at that location.

10       50.   On or about August 21, 2009, defendant DARBINYAN, in

11   a telephone conversation using coded language, told defendant

12   ZAKARYAN that he intended to punish victims Z, L.K., and others

13   for making decisions regarding criminal activity in Los Angeles

14   without DARBINYAN's authorization.

15       51.   On or about August 21, 2009, defendant DARBINYAN, in

16   a telephone conversation using coded language, told an unindicted

17   co-conspirator that DARBINYAN told victims Z, L.K., and others

18   that DARBINYAN is the only one who lays down the law in Los

19   Angeles, and that when he saw that victims Z, L.K., and others

20   had many people with them, he made a couple of calls and filled

21   the place (referring to the "Chicken House" restaurant) with

22   members and associates of Armenian Power.

23       52.   On or about August 21, 2009, defendant DARBINYAN, in

24   a telephone conversation using coded language, told an unindicted

25   co-conspirator that when the police arrived at the "Chicken

26   House" restaurant, he told the junior Armenian Power members and

27   associates who were acting tough to shut up so that the police

28   would not violate DARBINYAN's parole.

53.   On or about August 26, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that he and other members and associates of Armenian Power intended to assault victims Z, L.K., and others at the "Chicken House" restaurant, but police officers showed up and found their firearms.

54.   On or about August 27, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant PETROSIAN that victims Z and L.K. were not in a position to make decisions with regard to criminal matters in this town, and that DARBINYAN did not care that victim L.K. was a godson to a Thief-in-Law.

55.   On or about August 28, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ZAKARYAN that DARBINYAN did not care whether victim Z was backed by a Thief-in-Law.

56.   On or about September 2, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that he had threatened victim Z and his guys with physical violence, and DARBINYAN told victim Z that he had one week to pay money to DARBINYAN.

57.   On or about October 10, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ZAKARYAN that the police had seized at least four of their firearms at the "Chicken House" restaurant.

58.   On or about October 11, 2009, defendant DARBINYAN, in a telephone conversation using coded language, asked defendant MNATSAKANYAN to help DARBINYAN find some firearms because

33

1  DARBINYAN had recently lost some firearms, and MNATSAKANYAN

2  agreed to assist DARBINYAN in this regard.

3      59.   On or about October 12, 2009, defendant DARBINYAN, in

4  a telephone conversation using coded language, told defendant K.

5  YERKANYAN that he had acquired a firearm similar to K.

6  YERKANYAN's firearm with the laser scope that had been left at

7  the "Chicken House" restaurant, and DARBINYAN said he wanted to

8  deliver the firearm to K. YERKANYAN.

9      <u>Conspiracy to Extort Victims S.M. and E</u>

10     60.   On or about November 13, 2009, defendant DARBINYAN,

11 in a telephone conversation using coded language, discussed with

12 defendant BILEZIKCHYAN a plan to extort victim S.M. for money

13 that DARBINYAN believed he was owed and that involved criminal

14 figures in Moscow, Russia, and some Thieves-in-Law, and

15 BILEZIKCHYAN said DARBINYAN should feel free to extort victim

16 S.M. and that BILEZIKCHYAN would physically assault the Thieves-

17 in-Law involved.

18     61.   On or about November 13, 2009, defendant DARBINYAN,

19 in a telephone conversation using coded language, told defendant

20 PEMBEJIAN that DARBINYAN was going to have victim S.M. forced

21 into a car and that he would take $50,000 away from victim S.M.

22     62.   On or about November 13, 2009, an unindicted co-

23 conspirator, in a telephone conversation using coded language,

24 told defendant DARBINYAN that victim E was involved with the

25 money DARBINYAN believed victim S.M. owed to him, and DARBINYAN

26 said he wanted victim E caught and brought to him.

27     63.   On or about November 13, 2009, defendant DARBINYAN,

28 in a telephone conversation using coded language, spoke to

34

1  defendant MARKOSIAN about finding victim E, and DARBINYAN said if
2  MARKOSIAN could not find victim E, then DARBINYAN would find
3  victim E in a sadder manner.

4        64.   On or about November 14, 2009, defendant DARBINYAN,
5  in a telephone conversation using coded language, told defendant
6  PEMBEJIAN that DARBINYAN was going to physically assault victim
7  S.M., and DARBINYAN said he was upset that criminal figures in
8  Moscow were getting involved in this instance.

9        65.   On or about November 14, 2009, defendant DARBINYAN,
10 in a telephone conversation using coded language, told defendant
11 BILEZIKCHYAN that DARBINYAN had found victim E and sent some
12 people to get him, and that DARBINYAN learned that victim S.M.
13 had sent the $50,000 DARBINYAN believed was owed to him to
14 another criminal figure.

15       66.   On or about November 14, 2009, defendant
16 BILEZIKCHYAN, in a telephone conversation using coded language,
17 told defendant DARBINYAN that victim S.M. would bring DARBINYAN
18 the money at issue with a broken hand.

19       67.   On or about November 15, 2009, defendant DARBINYAN,
20 in a telephone conversation using coded language, told an
21 unindicted co-conspirator that DARBINYAN knew that victim S.M.
22 was lying to him and that DARBINYAN was going to punish victim
23 S.M.

24       68.   On or about November 15, 2009, defendant
25 BILEZIKCHYAN, in a telephone conversation using coded language,
26 told defendant DARBINYAN that they would take victim S.M.'s
27 money, and BILEZIKCHYAN said he and DARBINYAN make the justice
28 here.

69.   On or about November 19, 2009, an unindicted co-conspirator, in a telephone conversation using coded language, told defendant DARBINYAN that he was taking defendant TANGABEKYAN to the airport to fly to Las Vegas, Nevada, and meet with victim S.M.

70.   On or about November 22, 2009, defendant TANGABEKYAN, in a telephone conversation using coded language, told defendant DARBINYAN he had spoken with victim S.M. and let victim S.M. know that DARBINYAN was a significant criminal figure in America, and TANGABEKYAN said victim S.M. is going to send the money to DARBINYAN.

71.   On or about November 22, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that they were going to take $50,000 from victim S.M. and that DARBINYAN was going to take additional money as well.

72.   On or about November 22, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant TANGABEKYAN that he was going to take $50,000 from victim S.M.

Kidnapping and Extortion of Victim G.A.

73.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Tigran Sarkisyan ("Sarkisyan") to pick him up to drive BILEZIKCHYAN to the Downtown district of Los Angeles, California.

74.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant K. YERKANYAN that BILEZIKCHYAN was headed to

36

1  downtown Los Angeles with defendant Sarkisyan in order to kidnap

2  victim G.A., and BILEZIKCHYAN asked K. YERKANYAN to contact

3  defendants H. KARAYAN and PETROSIAN to advise them to be prepared

4  to assist in kidnapping victim G.A., and K. YERKANYAN agreed to

5  do so.

6      75.   On or about November 25, 2009, defendant

7  BILEZIKCHYAN, in a telephone conversation using coded language,

8  told defendant K. YERKANYAN to talk to defendant PETROSIAN about

9  where they should take victim G.A. after they seize him, and K.

10  YERKANYAN said he would do so.

11      76.   On or about November 25, 2009, defendant

12  BILEZIKCHYAN, in a telephone conversation using coded language,

13  told defendant O. TEROGANESYAN that he would be at O.

14  TEROGANESYAN's auto body shop, MR Auto Body Collision, in Los

15  Angeles, California, in about an hour, and O. TEROGANESYAN told

16  BILEZIKCHYAN he would be there for sure.

17      77.   On or about November 25, 2009, defendant

18  BILEZIKCHYAN, in a telephone conversation using coded language,

19  told defendant Sarkisyan that he was with victim G.A. now and

20  that victim G.A. was not going to come home anymore.

21      78.   On or about November 25, 2009, defendant

22  BILEZIKCHYAN, in a telephone conversation using coded language,

23  told defendant Suren Torosyan ("S. Torosyan") that BILEZIKCHYAN

24  would need him and asked S. Torosyan to keep his telephone on,

25  and S. Torosyan agreed to do so.

26

27

28

79.   On or about November 25, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, told defendant H. KARAYAN that he and others had taken victim G.A., who was with them, and H. KARAYAN offered to help the kidnappers.

80.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Sarkisyan that BILEZIKCHYAN had told victim G.A. that victim G.A. had to pay BILEZIKCHYAN $100,000 in order to be released and that victim G.A. had to pay BILEZIKCHYAN a total of $400,000 to avoid being kidnapped in the future.

81.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Sarkisyan that, at the location where they had taken and held victim G.A., there was a big hole in the ground and when victim G.A. saw the hole, he started crying in fear for his life.

82.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Sarkisyan that they had released victim G.A. and that defendant K. YERKANYAN and others took victim G.A. away from defendant O. TEROGANESYAN's auto body shop to collect money.

83.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Sarkisyan that BILEZIKCHYAN thought that victim G.A. might die from a heart attack, and that when victim G.A. saw that there were a few people with masks involved in his kidnapping, victim G.A. wet his pants.

84.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant S. Torosyan that BILEZIKCHYAN was at defendant O. TEROGANESYAN's auto body shop counting the money that victim G.A. had paid in exchange for his release, and S. Torosyan offered to help them.

85.   On or about November 25, 2009, defendant PETROSIAN, in a telephone conversation using coded language, told defendant BILEZIKCHYAN that PETROSIAN was sitting outside victim G.A.'s building waiting for victim G.A. to bring additional money.

86.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant PETROSIAN that BILEZIKCHYAN had been worried that victim G.A.'s heart was going to stop while they were holding him.

87.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that, prior to BILEZIKCHYAN's kidnapping of victim G.A., a Thief-in-Law had attempted to mediate BILEZIKCHYAN's dispute with victim G.A., but BILEZIKCHYAN did not like the Thief-in-Law's proposed resolution, so BILEZIKCHYAN decided to do things his own way and kidnap victim G.A.

88.   On or about November 26, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with defendant K. YERKANYAN splitting $200,000 in proceeds obtained as a result of the kidnapping of victim G.A.

1    89.   On or about December 24, 2009, defendant H. KARAYAN,

2  in a telephone conversation using coded language, told defendant

3  BILEZIKCHYAN that victim G.A. had a lot of gold hidden, and

4  BILEZIKCHYAN told H. KARAYAN to tell victim G.A. that Monday was

5  the last day to pay the money owed in connection with the

6  kidnapping.

7    <u>Additional Acts Of Extortion And Assault</u>

8    90.   On or about August 19, 2006, in the North Hollywood

9  district of Los Angeles, defendant HOVANISSIAN, and others known

10  and unknown to the Grand Jury, pointed a firearm at victim A.M.

11  and yelled "Armenian Power."

12    91.   On or about June 25, 2009, defendant DARBINYAN, in a

13  telephone conversation using coded language, told an unindicted

14  co-conspirator that DARBINYAN was going to physically assault

15  victim G.S. and that DARBINYAN would force victim G.S. to give

16  DARBINYAN forty percent of victim G.S.'s corporation.

17    92.   On or about July 10, 2009, defendant DARBINYAN, in a

18  telephone conversation using coded language, warned defendant

19  MNATSAKANYAN to discipline victim S, otherwise DARBINYAN would

20  call Armenia and have victim S's head taken off.

21    93.   On or about July 15, 2009, defendant SHAROPETROSIAN,

22  in a telephone conversation using coded language, told defendant

23  DARBINYAN that victim M.G. owed SHAROPETROSIAN approximately

24  $37,500, and that if victim M.G. did not pay SHAROPETROSIAN the

25  money, SHAROPETROSIAN would have victim M.G. beaten the next time

26  victim M.G. visits Yerevan, Armenia.

27    94.   On or about July 16, 2009, defendant TANGABEKYAN, in

28  a telephone conversation using coded language, told defendant

1  DARBINYAN that TANGABEKYAN was observing police officers
2  conducting a traffic stop of victim K.S., and DARBINYAN told
3  TANGABEKYAN that DARBINYAN wanted victim K.S. physically
4  assaulted once police officers had left victim K.S.'s presence.

5      95.   On or about July 16, 2009, defendant TANGABEKYAN, in
6  a telephone conversation using coded language, told defendant
7  DARBINYAN that TANGABEKYAN would continue to watch victim K.S.
8  and they would eventually get victim K.S.

9      96.   On or about August 13, 2009, defendant DARBINYAN, in
10 a telephone conversation using coded language, discussed with
11 defendant BILEZIKCHYAN a rumor started by victim A.Y. that
12 BILEZIKCHYAN had threatened an organized crime figure and his
13 family, and DARBINYAN said he wanted to find victim A.Y. and
14 physically assault him.

15     97.   On or about August 19, 2009, defendant DARBINYAN, in
16 a telephone conversation using coded language, told an unindicted
17 co-conspirator that he was looking for victim V in relation to a
18 stabbing involving victim V and DARBINYAN's godson, and DARBINYAN
19 said that victim V's connections with other Armenian organized
20 crime figures did not matter and if victim V does not come to see
21 DARBINYAN, then victim V might as well leave town.

22     98.   On or about August 19, 2009, defendant DARBINYAN, in
23 a telephone conversation using coded language, told an unindicted
24 co-conspirator that he planned to physically assault victim V.

25     99.   On or about August 19, 2009, defendant DARBINYAN, in
26 a telephone conversation using coded language, told victim V,
27 among other things, that in the world of Armenian organized
28

crime, victim V does not have enough power to settle any dispute with DARBINYAN.

100.  On or about September 6, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant K. YERKANYAN that there were many Armenians driving luxury cars and wearing expensive jewelry where BILEZIKCHYAN was in Palm Springs, California, and BILEZIKCHYAN told K. YERKANYAN that K. YERKANYAN should join BILEZIKCHYAN in Palm Springs so that they could rob other Armenians and make lots of money.

101.  On or about September 8, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that DARBINYAN was planning on kidnapping victim A.Y. from victim A.Y.'s house, and DARBINYAN said he was going to beat victim A.Y. and drag him out of his house.

102.  On or about September 28, 2009, an unindicted co-conspirator, in a telephone conversation using coded language, told defendant DARBINYAN that victim G has a lot of money, and that DARBINYAN should tell victim G that DARBINYAN would be victim G's godfather and protect victim G in order to force victim G to give DARBINYAN money, and DARBINYAN said he would call victim G.

103.  On or about January 22, 2010, defendant K. YERKANYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that K. YERKANYAN was in Las Vegas, Nevada, and wanted the address for an unspecified victim so that K. YERKANYAN could assault and rob the unspecified victim.

42

104.   On or about January 24, 2010, defendant K. YERKANYAN, in a telephone conversation using coded language, told defendant ZAKARYAN that K. YERKANYAN was going to assault an unspecified victim the next time K. YERKANYAN saw the unspecified victim.

### Acts of Robbery and Witness Intimidation

105.   In or around November 2006, defendant MURADYAN conspired with other Armenian Power gang members to intimidate a witness to a robbery committed by Armenian Power gang members so that the witness would not testify against the Armenian Power gang members involved in the robbery.

106.   On or about June 25, 2007, defendant FERMANYAN, and others known and unknown to the Grand Jury, entered a gas station in Burbank, California, and robbed victim A.M. at gunpoint.

### Acts Regarding Firearm Possession and Distribution

107.   On or about August 6, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant TARVERDYAN that there was a police car following him, and TARVERDYAN warned DARBINYAN that there was a firearm inside the car DARBINYAN was driving.

108.   On or about August 13, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed purchasing various firearms, including three firearms for approximately $1,500 each, with defendant PEMBEJIAN.

109.   On or about August 13, 2009, defendant DARBINYAN, in a telephone conversation using coded language, offered defendant ZAKARYAN a firearm for $2,500 and a smaller firearm for approximately $1,500, and ZAKARYAN said he wanted the smaller firearm for sure.

43

110.   On or about August 14, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant PETROSIAN that defendant ZAKARYAN should bring $1,500 to pay for the firearm, and PETROSIAN agreed to meet DARBINYAN.

111.   On or about August 14, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant TARVERDYAN that DARBINYAN had about two or three firearms that could be easily concealed, and TARVERDYAN said he would pick one up from DARBINYAN.

112.   On or about August 16, 2009, defendant ZAKARYAN, in a telephone conversation using coded language, told defendant DARBINYAN that an unindicted co-conspirator would be bringing two short firearms, and DARBINYAN said he wanted one of the short firearms as soon as possible.

113.   On or about August 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ZAKARYAN that if DARBINYAN is caught by police officers with the short firearm, DARBINYAN would be prosecuted and sentenced to 35 years in prison because the short firearm was an assault rifle.

114.   On or about August 24, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that DARBINYAN liked the firearm that the unindicted co-conspirator had provided to DARBINYAN, and DARBINYAN said that law enforcement officers had recently taken four of their firearms.

115.   On or about September 9, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, told

44

defendant E. KHACHATRYAN that K. YERKANYAN wanted to purchase a handgun with a silencer for approximately $1,300.

116.  On or about September 15, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told an unindicted co-conspirator to bring DARBINYAN a rifle.

117.  On or about October 13, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant BILEZIKCHYAN that DARBINYAN had been at Hatsatoun restaurant in Glendale, California, earlier that evening when some criminal figures made DARBINYAN mad and he fired a gun that defendant E. KHACHATRYAN had brought with him.

118.  On or about October 13, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant E. KHACHATRYAN to drive defendant DARBINYAN home following the shooting at Hatsatoun restaurant because DARBINYAN was on parole and would get in big trouble if he were caught shooting a gun.

119.  On or about November 14, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, spoke with an unindicted co-conspirator about exchanging K. YERKANYAN's current handgun for a ten millimeter handgun.

120.  On or about November 23, 2009, defendant Miguel Agustin Ramirez ("Ramirez"), in a telephone conversation using coded language, offered firearms to defendant DARBINYAN.

121.  On or about November 23, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant PEMBEJIAN that they should stop to see some firearms that defendant Ramirez was offering to DARBINYAN.

122. On or about November 24, 2009, defendant DARBINYAN, in a telephone conversation using coded language, asked defendant SEROBYAN to pick up firearms from defendant Gevork Kasabyan ("Kasabyan"), and SEROBYAN said he would pick up the guns and put them in the trunk of his car.

123. On or about November 24, 2009, defendants DARBINYAN and SEROBYAN possessed three firearms, namely, a Smith & Wesson model 638-2 .38 caliber revolver, a Star model 30M 9 millimeter caliber semi-automatic pistol, and an Intratec model Tec-22 .22 caliber semi-automatic pistol, as well as multiple rounds of ammunition.

124. On or about November 24, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, agreed to lend his handgun to an unindicted co-conspirator.

125. On or about November 30, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, reminded defendant K. YERKANYAN to hide his weapon.

126. On or about November 30, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant PEMBEJIAN delivering an Omega firearm to an Armenian organized crime elder as a gift.

127. On or about December 1, 2009, defendant DARBINYAN, in a telephone conversation using coded language, made plans with defendant PEMBEJIAN to meet PEMBEJIAN and an Armenian organized crime elder at the Montage Hotel in Beverly Hills to deliver the Omega firearm.

128. On or about December 1, 2009, defendant DARBINYAN possessed a firearm, namely, an Omega Arms model Omega III 30-06 caliber bolt action rifle.

129. On or about December 30, 2009, defendants BILEZIKCHYAN and K. YERKANYAN, and others known and unknown to the Grand Jury, met with defendant Gonzalez-Munoz Jr., a member of the Mexican Mafia, and his associates at a restaurant in Glendale, California, and BILEZIKCHYAN received from Gonzalez-Munoz Jr. a gun magazine containing approximately 35 rounds of .45 caliber ammunition.

130. On or about December 30, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that BILEZIKCHYAN had received as a gift from defendant Gonzalez-Munoz Jr. a .45 caliber high-capacity gun magazine, and that BILEZIKCHYAN and defendant K. YERKANYAN had never seen anything like it.

131. On or about December 30, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Marat Shakhramanyan ("Shakhramanyan") to go to the restaurant in Glendale, tell the owner that BILEZIKCHYAN sent him, and take home what the owner gives him.

132. On or about December 30, 2009, acting on behalf of defendant BILEZIKCHYAN, defendant Shakhramanyan picked up a black plastic bag containing the .45 caliber high-capacity gun magazine from the restaurant in Glendale.

133. On or about December 30, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that defendant Shakhramanyan had

1  been stopped and arrested after picking up the .45 caliber high-

2  capacity gun magazine.

3       134.  On or about January 19, 2010, defendant K. YERKANYAN,

4  in a telephone conversation using coded language, told defendant

5  E. KHACHATRYAN that junior Armenian Power gang members and

6  associates should bring firearms to a cemetery where other

7  Armenian Power gang members would be gathering later that day.

8       135.  On or about January 19, 2010, defendants E.

9  KHACHATRYAN, GALSTYAN, and Grachia Nalbandyan ("Nalbandyan"), and

10  others known and unknown to the Grand Jury, possessed firearms

11  and ammunition, namely, a Sig Sauer P220 .45 caliber semi-

12  automatic handgun, a Maadi Helwan 9 millimeter caliber handgun,

13  and fifteen rounds of ammunition.

14       136.  On or about January 19, 2010, defendants BILEZIKCHYAN

15  and K. YERKANYAN, in a telephone conversation using coded

16  language, discussed posting bail for the Armenian Power gang

17  members who had been caught by the police with firearms earlier

18  that day.

19       137.  On or about January 19, 2010, defendant BILEZIKCHYAN,

20  in a telephone conversation using coded language, told defendant

21  K. YERKANYAN that BILEZIKCHYAN was concerned that the seizure of

22  firearms earlier that day from Armenian Power gang members meant

23  that the police had been conducting surveillance on Armenian

24  Power gang members.

25       138.  On or about January 19, 2010, defendant GALSTYAN, in

26  a telephone conversation using coded language, told defendants

27  BILEZIKCHYAN and K. YERKANYAN that police officers had found

28

firearms in the car occupied by defendants E. KHACHATRYAN and
GALSTYAN.

139. On or about January 20, 2010, defendant BILEZIKCHYAN,
in a telephone conversation using coded language, told an
unindicted co-conspirator that the unindicted co-conspirator
should not tell anyone that it was BILEZIKCHYAN who posted bail
for the Armenian Power gang members caught with firearms on
January 19, 2010.

140. On or about January 24, 2010, defendant K. YERKANYAN,
in a telephone conversation using coded language, spoke with
defendant E. KHACHATRYAN about purchasing another firearm.

141. On or about January 27, 2010, defendant K. YERKANYAN,
in a telephone conversation using coded language, told defendant
GAMBARYAN that officers had gone to GAMBARYAN's residence at 4055
Lankershim Boulevard, #434, in Los Angeles, California, and
arrested defendants E. KHACHATRYAN, GALSTYAN, and Grigor
Garibyan, and GAMBARYAN informed K. YERKANYAN that there were
firearms at his place.

142. On or about January 27, 2010, defendants GAMBARYAN
and E. KHACHATRYAN, and other members and associates of Armenian
Power, possessed two firearms, namely, a Smith & Wesson model 659
9 millimeter caliber handgun, and a Colt model 1908 Automatic .25
caliber handgun.

143. On or about February 10, 2010, defendant K. YERKANYAN
possessed a firearm, namely, a Beretta model 92FS 9 millimeter
caliber semi-automatic pistol, and fifteen rounds of ammunition,
at his residence in Tujunga, California.

144. On or about February 10, 2010, defendant K. YERKANYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that police officers had searched his house that day and found a firearm.

145. On or about September 3, 2010, defendant ALOYAN possessed a Llama .22 caliber pistol and numerous rounds of ammunition.

Bank Fraud Targeting Victim P.J.C.

146. On or about January 26, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant ORTEGA using "check runners" to cash or deposit fraudulent checks associated with a bank account in the name of victim P.J.C.

147. On or about January 26, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ORTEGA to bring "check runners" to DARBINYAN's location.

148. On or about January 26, 2009, defendant Rafael Roger Zendejas ("Zendejas") cashed check number 3439, made payable to "Rafael Zendejas" in the amount of $10, drawn on Bank of America account number xxxxx-42953, in the name of victim P.J.C.

149. On or about January 26, 2009, defendant Joseph Mares ("Mares") deposited check number 3442, made payable to "Joseph Mares" in the amount of $15, drawn on Bank of America account number xxxxx-42953, in the name of victim P.J.C.

150. On or about January 28, 2009, defendants DARBINYAN, ORTEGA, and Manuk Terzyan ("Terzyan"), in telephone conversations using coded language, discussed committing bank fraud on a bank account in the name of victim P.J.C.

151.   On or about January 28, 2009, defendant Julio Cesar Rivas ("Rivas"), in a telephone conversation using coded language, told defendant DARBINYAN that defendant Zendejas had entered a bank to cash a fraudulent check associated with a bank account in the name of victim P.J.C. and that the check amount was $5,900.

152.   On or about January 28, 2009, defendant Zendejas attempted to cash check number 3444, made payable to "Rafael Roger Zendejas" in the amount of $5,900, drawn on Bank of America account number xxxxx-42953, in the name of victim P.J.C.

153.   On or about January 28, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant Rivas that police officers were about to arrest defendant Zendejas while he was attempting to cash a fraudulent check.

154.   On or about January 28, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant ORTEGA to call defendant Debra May-Lawson ("May-Lawson") to see if she had successfully cashed fraudulent checks associated with a bank account in the name of victim P.J.C.

155.   On or about January 28, 2009, defendant May-Lawson cashed check number 3438, made payable to "Debra Jane May Lawson" in the amount of $5,600, and check number 3443, made payable to "Debra Jane May-Lawson" in the amount of $5,600, both drawn on Bank of America account number xxxxx-42953, in the name of victim P.J.C.

<u>Bank Fraud Targeting Victim G.F.</u>

156. On or about March 9, 2009, defendant TANGABEKYAN transferred $45,000 from Bank of America account number xxxxx-68791, a trust account in the name of victim G.F., to Bank of America account number xxxxx-40707, a checking account in the name of victim G.F.

157. On or about March 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TANGABEKYAN giving defendant MORENO, a Mexican Mafia member, a fraudulent check as a gift, and DARBINYAN told TANGABEKYAN that they were planning on using the fraudulent checks they had that week.

158. On or about March 16, 2009, defendant DARBINYAN told defendant MNATSAKANYAN to meet him so that DARBINYAN could introduce MNATSAKANYAN to defendant MORENO.

159. On or about March 16, 2009, defendants DARBINYAN, TANGABEKYAN, MNATSAKANYAN, MORENO, and Samawi met together at Natalie's Peruvian Seafood restaurant in the Hollywood area of Los Angeles, California, to discuss, among other things, bank fraud.

160. On or about March 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant TANGABEKYAN to prepare fraudulent checks for a bank account in the name of victim G.F. so that defendant MORENO could take them to Orange County, California, to deposit or cash them, and TANGABEKYAN asked DARBINYAN to find out what amount TANGABEKYAN should write on the fraudulent checks.

1    161.   On or about March 16, 2009, defendant DARBINYAN, in a

2   telephone conversation using coded language, told defendants

3   MORENO and Samawi that DARBINYAN would have a fraudulent check

4   for a bank account in the name of victim G.F. deposited into

5   Samawi's bank account and that the deposited amount would be

6   approximately $26,300.

7    162.   On or about March 16, 2009, defendant DARBINYAN, in a

8   telephone conversation using coded language, talked to defendant

9   MORENO about getting MORENO expensive items.

10    163.   On or about March 16, 2009, defendant DARBINYAN, in a

11   telephone conversation using coded language, told defendant

12   TANGABEKYAN that they had to get defendant MORENO fraudulent

13   checks as promised in order to insure they were not disgraced.

14    164.   On or about March 17, 2009, defendant DARBINYAN, in a

15   telephone conversation using coded language, spoke to defendant

16   MORENO about people messing up, and MORENO told DARBINYAN to

17   break a bone, a kneecap, or a finger in such instances.

18    165.   On or about March 17, 2009, defendant TANGABEKYAN, in

19   a telephone conversation using coded language, told defendant

20   DARBINYAN that fraudulent checks he had prepared and that were

21   associated with a bank account in the name of victim G.F. were

22   ready.

23    166.   On or about March 17, 2009, defendants DARBINYAN,

24   TANGABEKYAN, MORENO, Terzyan, and Vartan Avedissian

25   ("Avedissian") met at AKA Euro Sports, in Studio City,

26   California, to discuss, among other things, bank fraud.

27    167.   On or about March 17, 2009, defendant DARBINYAN, in a

28   telephone conversation using coded language, discussed with

defendant MNATSAKANYAN account information for a bank account in the name of victim G.F.

168.  On or about March 17, 2009, defendant Terzyan, in a telephone conversation using coded language, told defendant DARBINYAN that he was approaching a bank to deposit a fraudulent check drawn on victim G.F.'s bank account into defendant Samawi's bank account.

169.  On or about March 17, 2009, defendant Terzyan deposited check number 1462, made payable to "Karen Hesham" in the amount of $26,400, drawn on Bank of America account number xxxxx-40707, in the name of victim G.F.

170.  On or about March 18, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendants MORENO and Samawi to withdraw funds fraudulently deposited into Samawi's bank account by purchasing cashier's checks in amounts between $6,500 and $7,000.

171.  On or about March 18, 2009, defendant Samawi purchased two cashier's checks, each in the amount of $6,500, and withdrew additional cash from her Bank of America account, bearing account number xxxxx-75143, using funds that had been fraudulently deposited into her account from the account of victim G.F.

172.  On or about March 18, 2009, defendants MORENO and Samawi, in a telephone conversation using coded language, told defendant DARBINYAN that they had gotten two $6,500 cashier's checks and withdrawn $1,000 in cash, and DARBINYAN told them they should take more money out of the bank account in cash.

173.   On or about March 18, 2009, defendant DARBINYAN, in telephone conversations using coded language, discussed with defendants TANGABEKYAN and MORENO fraudulently depositing additional money into defendant Samawi's bank account from victim G.F.'s bank account.

174.   On or about March 18, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant MORENO to write between $35,000 and $40,000 on a blank check drawn from victim G.F.'s bank account and to deposit the check.

175.   On or about March 18, 2009, defendants MORENO and Samawi deposited check number 1463, made payable to "Karen Hesham" in the amount of $38,000, drawn on Bank of America account number xxxxx-40707, in the name of victim G.F.

176.   On or about March 19, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant TANGABEKYAN that defendants MORENO and Samawi had deposited a fraudulent check drawn from victim G.F.'s bank account, and that the check amount was $38,000.

177.   On or about March 19, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendants TANGABEKYAN and MORENO splitting the proceeds of the bank fraud involving victim G.F. between themselves.

178.   On or about March 19, 2009, defendant Avedissian, in a telephone conversation using coded language, discussed with defendant DARBINYAN retrieving proceeds of the bank fraud involving victim G.F. from defendant MORENO.

179.   On or about March 19, 2009, defendant TANGABEKYAN transferred $40,000 from Bank of America account number xxxxx-

1   68791, a trust account in the name of victim G.F., to Bank of

2   America account number xxxxx-40707, a checking account in the

3   name of victim G.F.

4   <u>Bank Fraud Targeting Victim Y.G.</u>

5       180.  On or about March 30, 2009, defendant ORTEGA, in a

6   telephone conversation using coded language, told defendants

7   DARBINYAN and MNATSAKANYAN that ORTEGA had arrived at their

8   previously agreed upon meeting place to deliver "check runners,"

9   defendants Mares and Steven Wilson ("Wilson").

10      181.  On or about March 30, 2009, defendant DARBINYAN, in a

11  telephone conversation using coded language, told defendant

12  Terzyan to drive defendants Mares and Wilson to different Bank of

13  America bank branches to deposit checks from victim Y.G.'s bank

14  account.

15      182.  On or about March 30, 2009, defendant Terzyan drove

16  defendants Mares and Wilson to different Bank of America bank

17  branches in the Los Angeles, California area to cash fraudulent

18  checks from victim Y.G.'s bank account.

19      183.  On or about March 30, 2009, defendants DARBINYAN and

20  Terzyan, in a telephone conversation using coded language,

21  discussed fraudulent checks drawn from victim Y.G.'s bank account

22  in the amounts of $4,500 and $5,000.

23      184.  On or about March 30, 2009, defendant Wilson cashed

24  check number 304, made payable to "Steven A Wilson" in the amount

25  of $4,500, drawn on Bank of America account number xxxxx-13899,

26  in the name of victim Y.G.

27      185.  On or about March 30, 2009, defendant Mares cashed

28  check number 305, made payable to "Joseph Mares" in the amount of

1   $5,300, drawn on Bank of America account number xxxxx-13899, in
2   the name of victim Y.G.

3       186.   On or about March 30, 2009, defendant Mares cashed
4   check number 306, made payable to "Joseph Mares" in the amount of
5   $5,000, drawn on Bank of America account number xxxxx-13899, in
6   the name of victim Y.G.

7       187.   On or about March 30, 2009, defendant DARBINYAN, in a
8   telephone conversation using coded language, told defendant
9   Terzyan to direct defendant Wilson, who was waiting for bank
10  employees to verify whether he was authorized to cash another
11  check from victim Y.G.'s bank account, to immediately leave the
12  bank.

13      188.   On or about March 30, 2009, defendant DARBINYAN, in a
14  telephone conversation using coded language, told defendant
15  ORTEGA to pick up defendants Mares and Wilson from defendant
16  Terzyan, and they discussed splitting the proceeds of the bank
17  fraud targeting victim Y.G.

18      <u>Bank Fraud Targeting Victims F.D. and M.D.</u>

19      189.   On or about April 14, 2009, defendant DARBINYAN, in a
20  telephone conversation using coded language, told defendant Hagop
21  Yamalyan ("Yamalyan") to go to a 7-11 Store to pick up fraudulent
22  checks drawn from the bank account of victims F.D. and M.D. from
23  defendant TANGABEKYAN and to deliver the fraudulent checks to
24  defendant Terzyan.

25      190.   On or about April 14, 2009, defendant TANGABEKYAN, in
26  a telephone conversation using coded language, told defendant
27  DARBINYAN that defendant Yamalyan had come over to pick up the

28

1  fraudulent checks associated with the bank account of victims

2  F.D. and M.D.

3      191.  On or about April 14, 2009, defendant Terzyan, in a

4  telephone conversation using coded language, told defendant

5  DARBINYAN that he needed additional information to deposit a

6  fraudulent check drawn from the bank account of victims F.D. and

7  M.D. into a bank account under their control.

8      192.  On or about April 14, 2009, defendant DARBINYAN, in a

9  telephone conversation using coded language, discussed with

10  defendant TANGABEKYAN providing defendant Terzyan with additional

11  information in order to deposit a fraudulent check drawn from the

12  bank account of victims F.D. and M.D.

13      193.  On or about April 14, 2009, defendant Terzyan

14  deposited check number 2386, made payable to "RZ Diginet" in the

15  amount of $28,357, drawn on Bank of America account number XXXXX-

16  14509, in the name of victims F.D. and M.D.

17      194.  On or about April 14, 2009, defendant DARBINYAN, in a

18  telephone conversation using coded language, discussed with

19  defendant FNU LNU, aka "Musho" ("Musho"), that DARBINYAN had

20  fraudulent checks in the amounts of approximately $28,300 and

21  $72,000 in his possession.

22      195.  On or about April 14, 2009, defendant FNU LNU, aka

23  "David Petrosov" ("Petrosov"), deposited check number 2387, made

24  payable to "David Petrosov" in the amount of $74,350.09, drawn on

25  Bank of America account number XXXXX-14509, in the name of

26  victims F.D. and M.D.

27      196.  On or about April 14, 2009, defendant DARBINYAN, in a

28  telephone conversation using coded language, told defendant L.

58

OGANDGANYAN to check on bank accounts under their control because
DARBINYAN had just received a call saying that a fraudulent check
from the bank account of victims F.D. and M.D. had been deposited
and DARBINYAN wanted to confirm the deposit.

Bank Fraud Targeting Victim L.R.

197.  On or about April 15, 2009, defendant DARBINYAN, in a
telephone conversation using coded language, told defendant L.
OGANDGANYAN to impersonate an account holder and inquire into two
bank accounts under their control, and L. OGANDGANYAN agreed to
do so.

198.  On or about April 15, 2009, defendant MNATSAKANYAN,
in a telephone conversation using coded language, told defendant
DARBINYAN that MNATSAKANYAN was sending small amounts of money
through a bank account to see if the money would go through
before sending larger amounts of money through the account.

199.  On or about April 15, 2009, defendant DARBINYAN, in a
telephone conversation using coded language, told defendant L.
OGANDGANYAN that there would be small amounts of money coming
through a bank account, and L. OGANDGANYAN informed DARBINYAN
that those amounts had already arrived in the bank account.

200.  On or about April 15, 2009, defendant DARBINYAN, in a
telephone conversation using coded language, discussed with
defendant ORTEGA prior fraudulent checks he had given to ORTEGA
and told ORTEGA to come by the following day to pick up and
deposit a fraudulent check.

201.  On or about April 15, 2009, defendant DARBINYAN, in a
telephone conversation using coded language, discussed with

1  defendant MNATSAKANYAN depositing a fraudulent check drawn from
2  the bank account of victim L.R.

3    202.   On or about April 16, 2009, defendant MARKOSIAN, in a
4  telephone conversation using coded language, discussed with
5  defendant DARBINYAN depositing a fraudulent check drawn from the
6  bank account of victim L.R.

7    203.   On or about April 16, 2009, defendant MNATSAKANYAN,
8  in a telephone conversation using coded language, told defendant
9  ORTEGA that he would meet ORTEGA in Hollywood in two hours to
10 give him the fraudulent check.

11   204.   On or about April 16, 2009, defendant DARBINYAN, in a
12 telephone conversation using coded language, asked defendant
13 MARKOSIAN the amount of the fraudulent check, and MARKOSIAN said
14 the check amount was $135,200.

15   205.   On or about April 17, 2009, a co-schemer deposited
16 check number 1459, made payable to "Ruzanna Hakobyan" in the
17 amount of $135,200, drawn on Citibank account number xxxx-7159,
18 in the name of victim L.R.

19   206.   On or about April 17, 2009, defendant DARBINYAN, in a
20 telephone conversation using coded language, discussed with
21 defendant MARKOSIAN when the fraudulent deposit would appear in a
22 bank account in the name of "Ruzanna Hakobyan," which was under
23 their control.

24   207.   On or about April 17, 2009, defendant DARBINYAN, in a
25 telephone conversation using coded language, gave defendant L.
26 OGANDGANYAN the account number for the bank account in the name
27 of "Ruzanna Hakobyan," and DARBINYAN asked L. OGANDGANYAN to
28 monitor the account.

**Bank Fraud and Access Device Fraud Targeting Customers of
99 Cents Only Stores**

208.   On or about July 6, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TARVERDYAN their plan to install and later remove skimming devices inside credit/debit card terminals at 99 Cents Only Stores to obtain and use bank debit card numbers of store customers.

209.   On or about July 6, 2009, defendants TARVERDYAN and Andranik Bakhchadjian ("Bakhchadjian") entered a 99 Cents Only Store in Whittier, California, to carry out the scheme to install and remove skimming devices.

210.   On or about July 13, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendants PETROSIAN and Garen Chouldjian ("Chouldjian") that a co-schemer was going to deliver victim account information the following day or Friday.

211.   On or about July 14, 2009, defendants TARVERDYAN and Bakhchadjian went to three different 99 Cents Only Stores in Riverside, California, to carry out the scheme to install and remove skimming devices.

212.   On or about July 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant PETROSIAN that DARBINYAN had fraudulently obtained debit card account numbers and needed four "runners" for the following day to withdraw money using the fraudulently obtained debit card account numbers.

213.   On or about July 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant Khachatur Arakelyan ("Arakelyan") that DARBINYAN needed four "runners" the following day to withdraw money using the fraudulently obtained debit card account numbers.

214.   On or about July 16, 2009, defendant TARVERDYAN, in a telephone conversation using coded language, asked defendant DARBINYAN if DARBINYAN would be using "runners" to withdraw money using fraudulently obtained debit card account numbers the following day, and DARBINYAN said yes.

215.   On or about July 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant Chouldjian that he needed four to five "runners" the following day to withdraw money and that DARBINYAN had approximately 400 fraudulently obtained account numbers, and Chouldjian said that the runners would withdraw the money from ATMs.

216.   On or about July 17, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TARVERDYAN having "runners" withdraw money that day.

217.   On or about July 17, 2009, defendant TARVERDYAN, in a telephone conversation using coded language, told defendant DARBINYAN that he had fraudulently obtained account numbers from Wells Fargo Bank, and TARVERDYAN asked DARBINYAN if he was ready to provide a second set of fraudulently obtained account numbers to the "runners."

218.   On or about July 17, 2009, defendants DARBINYAN and Arakelyan, in a telephone conversation using coded language,

1  discussed the status of their efforts to withdraw money using the
2  fraudulently obtained account numbers.

3      219.  On or about July 17, 2009, defendants DARBINYAN and
4  TARVERDYAN, in a telephone conversation using coded language,
5  discussed having "runners" withdraw funds before and after
6  midnight to avoid bank ATM withdrawal limits.

7      220.  On or about July 17, 2009, defendant Vardan
8  Amirkhanyan ("Amirkhanyan") and other co-schemers known and
9  unknown to the Grand Jury withdrew money from several bank
10  accounts in the names of victims who had shopped at 99 Cents Only
11  Stores, using various ATMs within the Central District of
12  California.

13      221.  On or about July 18, 2009, defendant DARBINYAN, in a
14  telephone conversation using coded language, discussed with
15  defendant Rafael Parsadanyan ("Parsadanyan") how the "runners"
16  had withdrawn funds before and after midnight to avoid bank ATM
17  withdrawal limits, and Parsadanyan said there were some
18  fraudulent debit cards left over.

19      222.  On or about July 18, 2009, defendant PETROSIAN, in a
20  telephone conversation using coded language, told defendant
21  DARBINYAN that the "runners" were all there and working that day.

22      223.  On or about July 18, 2009, defendant DARBINYAN, in a
23  telephone conversation using coded language, discussed with
24  defendant TARVERDYAN distributing proceeds from the fraudulent
25  bank withdrawals, and DARBINYAN told TARVERDYAN that he was going
26  to send defendant Parsadanyan to deliver approximately $30,000 to
27  TARVERDYAN because DARBINYAN did not want to drive with that cash
28  in his possession.

224. On or about July 18, 2009, defendant Parsadanyan possessed approximately $30,000 in fraudulently obtained criminal proceeds inside a plastic bag.

225. On or about July 18, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TARVERDYAN sending co-schemers to withdraw money using fraudulent debit cards.

226. On or about July 18 and July 19, 2009, defendant Amirkhanyan and other co-schemers known and unknown to the Grand Jury withdrew money from several bank accounts in the names of victims who had shopped at 99 Cents Only Stores, using various ATMs within the Central District of California.

227. On or about July 20, 2009, defendant TARVERDYAN and an unidentified co-schemer entered a 99 Cents Only Store in Riverside, California, to carry out the scheme to install and remove skimming devices.

228. On or about July 20, 2009, defendant PETROSIAN, in a telephone conversation using coded language, discussed with defendant DARBINYAN what percentage from the fraudulently obtained money they were supposed to pay the "runners."

229. On or about July 21, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed installing skimming devices at 99 Cents Only Stores with defendant TARVERDYAN.

230. On or about July 21, 2009, defendant TARVERDYAN, in a telephone conversation using coded language, told defendant DARBINYAN that employees of 99 Cents Only Stores may have

64

discovered some of the skimming devices they had installed at debit/credit card terminals.

231.   On or about July 22, 2009, defendants Bakhchadjian and Vartenie Ananian ("Ananian") entered a 99 Cents Only Store in Riverside, California, to carry out the scheme to install and remove skimming devices.

232.   On or about August 8, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TARVERDYAN installing skimming devices that day.

233.   On or about August 8, 2009, defendants Bakhchadjian and Ananian, and other co-schemers known and unknown to the Grand Jury, went to a 99 Cents Only Store in Ventura, California, to carry out the scheme to install and remove skimming devices.

234.   On or about August 8, 2009, co-schemers known and unknown to the Grand Jury went to a 99 Cents Only Store in North Hollywood, California, to carry out the scheme to install and remove skimming devices.

235.   On or about August 13, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant PEMBEJIAN that defendant Bakhchadjian would be installing skimming devices soon.

236.   On or about August 13 and August 14, 2009, co-schemers known and unknown to the Grand Jury went to 99 Cents Only Stores in San Diego, California, to carry out the scheme to install and remove skimming devices.

237.   On or about August 14, 2009, defendants Bakhchadjian and Ananian went to 99 Cents Only Stores in Huntington Beach,

1    California, to carry out the scheme to install and remove

2    skimming devices.

3        238.   On or about August 19, August 20, and August 21,

4    2009, unidentified co-schemers withdrew money from several bank

5    accounts in the names of victims who had shopped at 99 Cents Only

6    Stores, using various ATMs within the Central District of

7    California.

8        239.   On or about August 24, 2009, defendants Bakhchadjian

9    and Ananian, and other co-schemers known and unknown to the Grand

10   Jury, attempted to retrieve a skimming device from a 99 Cents

11   Only Store in Huntington Beach, California.

12       240.   On or about August 27, 2009, defendant DARBINYAN, in

13   a telephone conversation using coded language, told defendant

14   Parsadanyan that he was on his way to San Diego, California, to

15   meet with defendant ORTEGA regarding the scheme to install and

16   remove skimming devices.

17       241.   On or about August 27, 2009, defendants ORTEGA and

18   Catrina Balderrama ("Balderrama"), and other co-schemers known

19   and unknown to the Grand Jury, went to at least two 99 Cents Only

20   Stores in San Diego, California, to carry out the scheme to

21   install and remove skimming devices.

22       242.   On or about August 28, 2009, defendant DARBINYAN, in

23   a telephone conversation using coded language, asked defendant

24   TARVERDYAN if TARVERDYAN could prepare counterfeit and

25   unauthorized access devices, and TARVERDYAN agreed to do so.

26       243.   On or about September 16, 2009, defendant DARBINYAN,

27   in a telephone conversation using coded language, asked defendant

28   Simon Antonyan ("Antonyan") how many unauthorized access devices

1 they were supposed to give to defendant ORTEGA for his work in

2 the scheme to install and remove skimming devices at 99 Cents

3 Only Stores, and Antonyan said they were supposed to give ORTEGA

4 approximately 500 unauthorized access devices.

5     Bank Fraud Targeting Victim K.K.

6     244.  On or about July 27, 2010, defendant SHAROPETROSIAN,

7 in a telephone conversation using coded language, discussed with

8 an unindicted co-schemer committing bank fraud on an account

9 worth over $700,000, and SHAROPETROSIAN said he has been working

10 with an incarcerated co-schemer to perpetrate bank fraud on

11 various victim bank accounts.

12     245.  On or about July 27, 2009, defendant SHAROPETROSIAN,

13 in a telephone conversation using coded language, told an

14 unindicted co-schemer that SHAROPETROSIAN had obtained bank

15 account information for victim K.K., and SHAROPETROSIAN provided

16 the co-schemer with victim K.K.'s social security number and told

17 the co-schemer to get him victim K.K.'s address.

18     246.  On or about August 13, 2009, an incarcerated co-

19 schemer working with defendant SHAROPETROSIAN called a customer

20 service representative for JP Morgan Chase Bank, pretended to be

21 victim K.K., and obtained information about victim K.K.'s bank

22 account, including the balance and recent check activity

23 associated with the account.

24     247.  On or about August 13, 2009, two unindicted co-

25 schemers working with defendant SHAROPETROSIAN, in a telephone

26 conversation using coded language, discussed having checks

27 delivered to victim K.K.'s address so that they could intercept

28 the checks and take money from victim K.K.'s bank account.

Bank Fraud Targeting Victim M.C.

248.   On or about July 28, 2009, an unindicted co-schemer, in a telephone conversation using coded language, provided defendant SHAROPETROSIAN with victim M.C.'s personal identifying information, including victim M.C.'s address, date of birth, and social security number, and gave SHAROPETROSIAN victim M.C.'s Bank of America account information.

249.   On or about July 28, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told an unindicted co-schemer that SHAROPETROSIAN had checked on victim M.C.'s bank accounts and that one of victim M.C.'s bank accounts contained approximately $108,000.

250.   On or about July 29, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told an unindicted co-schemer that other co-schemers would steal victims' checks from their houses.

251.   On or about August 3, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told defendant MARKOSIAN that SHAROPETROSIAN would have co-schemers provide MARKOSIAN with fraudulent checks for victim M.C.'s bank account, and MARKOSIAN discussed depositing the fraudulent checks the following day.

252.   On or about August 3, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told an unindicted co-schemer to tell another unindicted co-schemer working at Citibank to bring them victim bank accounts.

253.   On or about August 13, 2009, an incarcerated co-schemer working with defendant SHAROPETROSIAN called Bank of

1 America customer service and obtained information regarding

2 victim M.C.'s account balances and recent check activity.

3     <u>Bank Fraud Targeting Victim J.L.</u>

4     254. On or about August 6, 2009, an unindicted co-schemer,

5 in a telephone conversation using coded language, told defendant

6 SHAROPETROSIAN that she was working on forging the signature on a

7 fraudulent check drawn from the bank account of victim J.L., and

8 SHAROPETROSIAN said defendant MARKOSIAN would come to pick up the

9 fraudulent check in about an hour.

10     255. On or about August 6, 2009, defendant MARKOSIAN, in a

11 telephone conversation using coded language, told defendant

12 SHAROPETROSIAN that he was on his way to pick up the fraudulent

13 check drawn from the bank account of victim J.L. and that the

14 fraudulent check would be deposited that day.

15     256. On or about August 6, 2009, an unindicted co-schemer,

16 in a telephone conversation using coded language, told defendant

17 SHAROPETROSIAN that she was able to forge the signature on the

18 fraudulent check drawn from the bank account of victim J.L.

19     257. On or about August 6, 2009, defendant SHAROPETROSIAN,

20 in a telephone conversation using coded language, told an

21 unindicted co-schemer to write out approximately $44,000 for the

22 fraudulent check drawn from the bank account of victim J.L., and

23 SHAROPETROSIAN discussed forging other fraudulent checks.

24     258. On or about August 6, 2009, defendant MARKOSIAN, in a

25 telephone conversation using coded language, told defendant

26 SHAROPETROSIAN that the fraudulent check drawn from the bank

27 account of victim J.L. was for $44,000, and MARKOSIAN discussed

28 cashing other fraudulent checks.

259.   On or about August 6, 2009, two unindicted co-schemers possessed check number 2117, made payable to "Gagik Karapetyan" in the amount of $44,730.17, drawn from Citibank account number xxxx-xxx-3182, in the name of victim J.L., that had been provided to them by defendants SHAROPETROSIAN and MARKOSIAN and another unindicted co-schemer.

260.   On or about August 6, 2009, defendant MARKOSIAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that the co-schemers who were going to cash the fraudulent check drawn from the bank account of victim J.L. had been stopped by police officers before depositing the fraudulent check.

261.   On or about August 7, 2009, defendant MARKOSIAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that the co-schemers who were supposed to deposit the fraudulent check drawn from the bank account of victim J.L. had put the fraudulent check in the glove compartment, but that police officers had found the fraudulent check.

Bank Fraud Targeting Victim N.A.

262.   On or about August 19, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with defendant MARKOSIAN a bank account belonging to victim N.A., and MARKOSIAN said they should try to withdraw approximately $45,000 from that account.

263.   On or about August 20, 2009, an unindicted co-schemer, in a telephone conversation using coded language, gave defendant SHAROPETROSIAN numerous bank account numbers for bank

accounts belonging to victim N.A. and said the bank accounts contained over $200,000.

264.   On or about August 26, 2009, an unindicted co-schemer, in a telephone conversation using coded language, provided defendant SHAROPETROSIAN with victim N.A.'s bank account numbers, address, social security number, mother's maiden name, and other personal identifying information, and SHAROPETROSIAN said he only needed checks for victim N.A.'s bank accounts to perpetrate the bank fraud.

265.   On or about August 27, 2009, an incarcerated co-schemer working with defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with another unindicted co-schemer ordering checks associated with victim N.A.'s bank accounts.

266.   On or about August 30, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, provided an unindicted co-schemer with victim N.A.'s personal identifying information, and SHAROPETROSIAN instructed the co-schemer to call Bank of America customer service to impersonate victim N.A. and obtain account balance information for victim N.A.'s account.

Bank Fraud Targeting Victims K.W.K. and H.K.

267.   On or about August 20, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, obtained bank account information and personal identifying information, including names, an address, and social security numbers, for victims K.W.K. and H.K.

268.   On or about August 20, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, told defendant DARBINYAN that SHAROPETROSIAN wanted information concerning bank accounts with high-dollar balances, like in the $400,000 to $500,000 range, and that SHAROPETROSIAN had set up a good bank fraud scheme with another prison inmate.

269.   On or about August 20, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that DARBINYAN had account information for a Wells Fargo Bank victim with approximately $200,000 in his account, and SHAROPETROSIAN said he wanted victim bank accounts from Washington Bank, Citibank, and Bank of America, and that he was working with people who could obtain such victims' personal information.

Bank Fraud and Access Device Fraud Involving
Defendants BILEZIKCHYAN, K. YERKANYAN, and ALOYAN

270.   On or about November 15, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer receiving via the U.S. mail information regarding a bank account opened in the name of a bank fraud victim using the victim's personal identifying information, and K. YERKANYAN discussed obtaining a post office box to receive the bank account information.

271.   On or about November 16, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer obtaining personal identifying information for bank fraud victims.

272.   On or about November 16, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer receiving via U.S. mail information regarding a bank account opened in the name of a victim using the victim's personal identifying information, and they also discussed the credit score of a bank fraud victim.

273.   On or about November 21, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer their possession of personal identifying information for a bank fraud victim who was the mother of a police officer, and that they had obtained a post office box to receive mail regarding fraudulently opened bank accounts.

274.   On or about November 23, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer providing the co-schemer with personal identifying information for bank fraud victims.

275.   On or about November 25, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer obtaining a fake identification document to aid in fraudulently opening bank accounts.

276.   On or about January 8, 2010, an unindicted co-schemer, in a telephone conversation using coded language, told defendant BILEZIKCHYAN that the co-schemer wanted to fraudulently cash a cashier's check worth $10,000, and BILEZIKCHYAN told the co-schemer to give the cash to defendant K. YERKANYAN.

277.   On or about January 8, 2010, defendant K. YERKANYAN, in a telephone conversation using coded language, spoke with defendant Edgar Yerkanyan ("E. Yerkanyan") about fraudulently cashing a cashier's check worth $10,000.

278.   On or about March 10, 2010, defendants BILEZIKCHYAN and ALOYAN met with an unindicted co-schemer in Murrieta, California, to discuss committing bank fraud on high-value bank accounts, including a bank account in the name of victim S.T.

279.   On or about March 10, 2010, defendant ALOYAN provided an unindicted co-schemer with Bank of America account information for a bank account in the name of victim S.T. containing approximately $190,371.

280.   On or about March 10, 2010, defendant ALOYAN obtained credit reports for victim S.T. and provided the credit reports to an unindicted co-schemer.

Additional Bank Fraud Activity

281.   On or about June 21, 2009, defendant TANGABEKYAN called the JP Morgan Chase Bank automated customer service number, entered account information for the bank account of victim R.M. to obtain the current balance for the account and recent account activity, and was informed that the balance for victim R.M.'s account was $369,626.37.

282.   On or about June 22, 2009, defendant TANGABEKYAN called the JP Morgan Chase Bank automated customer service number, entered account information for the bank account of victims J.D. and M.D. to obtain the current balance for the account and recent account activity, and was informed that the

current balance for victims J.D.'s and M.D.'s account was $328,362.86.

283. On or about June 22, 2009, defendant TANGABEKYAN called the JP Morgan Chase Bank automated customer service number, entered account information for the bank account of victim R.T. to obtain the current balance for the account and recent account activity, and was informed that the current balance for victim R.T.'s account was $217,301.69.

284. On or about June 23, 2009, defendant TANGABEKYAN called the JP Morgan Chase Bank customer service number, entered account information for the bank account of victim R.M., spoke to a customer service representative, and obtained balances for various bank accounts of victim R.M.

285. On or about July 8, 2009, defendant TANGABEKYAN, in a telephone conversation using coded language, told defendant DARBINYAN that TANGABEKYAN would bring fraudulent checks for two bank accounts to DARBINYAN that day, and that the fraudulent checks for another bank account would be ready the following day.

286. On or about July 13, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant TANGABEKYAN that a fraudulent check had cleared, and DARBINYAN asked TANGABEKYAN to write another fraudulent check for approximately $75,000; TANGABEKYAN then responded that he would do so with great pleasure.

287. On or about July 16, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TANGABEKYAN fraudulent checks prepared by TANGABEKYAN.

288. On or about July 23, 2009, defendants SHAROPETROSIAN and AIRAPETIAN, in a telephone conversation using coded language, discussed finding "runners" to fraudulently cash and deposit checks.

289. On or about July 27, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, asked defendant AIRAPETIAN to deliver checks to an unindicted co-schemer so that she could forge the signatures.

290. On or about July 29, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with defendant AIRAPETIAN committing bank fraud and giving defendant MARKOSIAN twenty-five percent of the proceeds for cashing a fraudulent check.

291. On or about August 5, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant TANGABEKYAN preparing fraudulent checks for victim accounts at Bank of America, Wells Fargo Bank, and Citibank.

292. On or about August 28, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with an unindicted co-schemer writing fraudulent checks for victim bank accounts.

293. On or about September 1, 2009, defendant SHAROPETROSIAN, in a telephone conversation using coded language, discussed with defendant AIRAPETIAN recruiting "runners" to withdraw money from banks, including Bank of America, using fraudulently obtained access devices.

294. On or about September 1, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, told defendant

SHAROPETROSIAN that, in general, the maximum amount they would be able to withdraw from Bank of America bank accounts they had fraudulently gained access to would be $500 per day.

295. On or about September 1, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that he had contacted an employee of Citibank who would be able to provide them with bank customer information, and SHAROPETROSIAN and AIRAPETIAN discussed obtaining bank information for customers who were older in age and who had high-value accounts.

296. On or about September 9, 2009, defendant TANGABEKYAN, in a telephone conversation using coded language, discussed with defendant DARBINYAN fraudulent checks and bank account information for victim bank accounts from Citibank and Wells Fargo Bank.

297. On or about September 11, 2009, defendant AIRAPETIAN, in a telephone conversation using coded language, discussed with defendant SHAROPETROSIAN distributing unauthorized access devices to "runners" in order to fraudulently withdraw money from bank accounts.

298. On or about September 30, 2009, defendant TARVERDYAN, in a telephone conversation using coded language, told defendant DARBINYAN that TARVERDYAN would write out some fraudulent checks and give them to DARBINYAN, and DARBINYAN said they cheated someone out of $300,000 that day.

299. On or about October 10, 2009, defendant K. YERKANYAN, in a telephone conversation using coded language, asked defendant

1  DARBINYAN for fraudulent checks because K. YERKANYAN had victim

2  bank accounts at Wells Fargo Bank and Citibank that he could use.

3      300.  On or about October 13, 2009, defendant

4  SHAROPETROSIAN, in a telephone conversation using coded language,

5  asked defendant DARBINYAN if he had victim bank account

6  information, and DARBINYAN said he had available a victim bank

7  account from Wells Fargo Bank worth about $200,000.

8      301.  On or about December 1, 2009, defendant TANGABEKYAN,

9  in a telephone conversation using coded language, asked defendant

10  DARBINYAN to look up information regarding a fraudulent check

11  worth about $150,000 that TANGABEKYAN had written.

12      <u>Identity Theft and Access Device Fraud Using the Saticoy</u>

13      <u>Location</u>

14      302.  On or about January 16, 2010, defendant H. KARAYAN,

15  in a telephone conversation using coded language, discussed with

16  defendant TARVERDYAN the need to get their fraudulent business

17  going so that they could make some money.

18      303.  On or about January 21, 2010, defendant H. KARAYAN,

19  in a telephone conversation using coded language, discussed with

20  defendant TARVERDYAN that they had six individuals ready to work

21  on their financial fraud business and discussed the need to rent

22  office space.

23      304.  On or about January 22, 2010, defendant H. KARAYAN,

24  in a telephone conversation using coded language, discussed with

25  defendant A. KARAYAN that H. KARAYAN and defendant Gagik

26  Zhamkochyan ("Zhamkochyan") had found space for their financial

27  fraud business on Saticoy.

28

305.  On or about January 25, 2010, defendant Arsen Ayranjian ("Ayranjian") signed a two-year lease for space at 13847 Saticoy Street in North Hollywood, California ("Saticoy"), stating that the property would be used only for a food pickling company and related storage.

306.  On or about January 25, 2010, defendant A. KARAYAN issued a cashier's check for $7,750 to DRZ Partners to lease office space at Saticoy.

307.  On or about January 25, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant Zhamkochyan using the space at Saticoy for their financial fraud business, and H. KARAYAN instructed Zhamkochyan to contact defendants A. KARAYAN and Karapet Joey Karamusyan ("Karamusyan") regarding activities at Saticoy.

308.  On or about January 25, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant A. KARAYAN the lease for office space at Saticoy.

309.  On or about January 25, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant A. KARAYAN moving furniture into the office space at Saticoy, and H. KARAYAN told A. KARAYAN to instruct defendants Karamusyan and Ayranjian to obtain insurance for the financial fraud business at Saticoy.

310.  On or about January 25, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant Karamusyan individuals whom they could pay in exchange for use of their identities in fraudulent activity.

311. On or about January 26, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant Zhamkochyan individuals whom they could pay in exchange for use of their identities in fraudulent activity.

312. On or about January 26, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant TARVERDYAN moving into the office space at Saticoy, and H. KARAYAN said he would contact defendant Karamusyan.

313. On or about January 27, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant Zhamkochyan moving into the office space at Saticoy and that defendants Karamusyan and Haroutioun Arthur Melkonian ("Melkonian") would also be there.

314. On or about January 27, 2010, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, Zhamkochyan, Karamusyan, and Melkonian went to the office at Saticoy.

315. On or about January 28, 2010, defendants H. KARAYAN and Zhamkochyan went to the office at Saticoy.

316. On or about February 1, 2010, defendant TARVERDYAN, in a telephone conversation using coded language, asked defendant H. KARAYAN when they should go to the office at Saticoy and make some money.

317. On or about February 3, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told defendant Zhamkochyan that defendants A. KARAYAN, TARVERDYAN, and Melkonian were at Saticoy.

318. On or about February 3, 2010, defendant H. KARAYAN went to the office at Saticoy.

319.  On or about February 10, 2010, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, Zhamkochyan, Karamusyan, and Melkonian possessed pre-paid telephone cards, marked with their names, for their use in connection with the financial fraud business at Saticoy.

320.  On or about February 10, 2010, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, Zhamkochyan, Karamusyan, and Melkonian possessed rubber fingerprint covers to prevent their fingerprints from appearing on the documents and items inside Saticoy.

321.  On or about February 10, 2010, defendants H. KARAYAN, A. KARAYAN, TARVERDYAN, Zhamkochyan, Karamusyan, and Melkonian possessed a "reader-writer" device used to re-encode the magnetic strips on access devices, such as credit and debit cards, and possessed "skimming devices" used to collect means of identification, including account numbers, from gas station pumps.

322.  On or about February 10, 2010, defendant H. KARAYAN made false and misleading statements and representations to law enforcement and claimed that he had never been to Saticoy, did not lease or own office space at Saticoy, and did not operate a financial fraud business at Saticoy.

323.  On or about August 24, 2010, defendant Ayranjian made false and misleading statements and representations to law enforcement about his involvement with the operation of Saticoy and told law enforcement that when he signed the lease for the office space at Saticoy, he intended for that space to be used as an import-export business for canned foods.

<u>Additional Acts of Identity Theft and Access Device Fraud</u>

324.  On or about October 21, 2004, defendant DARBINYAN withdrew money from Bank of America bank accounts belonging to others, and possessed approximately $24,527 in proceeds from bank fraud.

325.  On or about October 21, 2004, defendant DARBINYAN possessed fifteen or more counterfeit and unauthorized access devices, that is, at least 150 debit card account numbers in the names of other people.

326.  On or about December 8, 2004, defendants H. TOROSYAN and SEROBYAN, and others, possessed a skimming device and an encoding device, that is, devices that can be used to create counterfeit or unauthorized access devices.

327.  On or about December 8, 2004, defendants H. TOROSYAN and SEROBYAN, and others, used and possessed fifteen or more counterfeit and unauthorized access devices.

328.  On or about August 24, 2007, defendant TOPADZHIKYAN possessed the means of identification of another person, specifically, the name, date of birth, social security number, and bank account numbers belonging to victim P.S., without the consent, knowledge, or authorization of victim P.S.

329.  On or about July 1, 2009, defendant DARBINYAN, in a telephone conversation using coded language, asked defendant MNATSAKANYAN to prepare a fraudulent access device for DARBINYAN, and MNATSAKANYAN said he could do so.

330.  On or about August 17, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant BILEZIKCHYAN that DARBINYAN had tried five fraudulent access

devices at a 7-11 Store, but they were defective so DARBINYAN was going to get more, and BILEZIKCHYAN said he needed some fraudulent access devices too.

331.   On or about November 6, 2009, defendants H. TOROSYAN and TOPADZHIKYAN, and others unknown to the Grand Jury, went to a gas station in La Verne, California, to install a skimming device.

332.   On or about November 6, 2009, defendants H. TOROSYAN, SEROBYAN, and TOPADZHIKYAN, and others unknown to the Grand Jury, installed, controlled, and possessed a skimming device, and possessed a gas station master key that could be used to install a skimming device.

333.   On or about November 6, 2009, defendants H. TOROSYAN, SEROBYAN, and TOPADZHIKYAN, and others unknown to the Grand Jury, possessed credit reports for victims R.P. and D.L.

334.   On or about May 25, 2010, defendant TOPADZHIKYAN possessed counterfeit access devices and the means of identification of other persons for the purpose of committing identity theft and access device fraud.

335.   On or about May 25, 2010, defendant TOPADZHIKYAN possessed device-making equipment, such as a reader-writer encoder, an embosser, and a tipping machine, for the purpose of creating counterfeit access devices.

336.   On or about September 3, 2010, defendant ALOYAN possessed approximately 47 access devices, including 23 credit card numbers and 24 bank account numbers, in the names of other people, without their consent, knowledge, or authorization.

337.   On or about September 3, 2010, defendant ALOYAN possessed five or more identification documents and false identification documents, and knowingly possessed means of identification for other people, without their consent, knowledge, or authorization.

338.   On or about September 3, 2010, defendant ALOYAN possessed checks and other bank account information in the names of other people, without their consent, knowledge, or authorization.

<u>Conspiracy to Possess with Intent to Distribute Stolen Marijuana</u>

339.   On or about August 5, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with defendant S. Torosyan the fact that defendant Arnold Moradians ("Moradians") sells large quantities of marijuana.

340.   On or about August 6, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, spoke with defendant Adam Davoodian ("Davoodian") and asked Davoodian if he had ever purchased marijuana from defendant Moradians, and Davoodian stated that he had just purchased $20,000 worth of marijuana from Moradians.

341.   On or about August 7, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Moradians that BILEZIKCHYAN would bring some people to help Moradians package marijuana.

342.   On or about August 8, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Artur Gabrelyan ("Gabrelyan") that defendant Moradians had two

1  million dollars worth of marijuana and needed help vacuuming and

2  packaging the marijuana, and Gabrelyan agreed to meet with

3  BILEZIKCHYAN and help out.

4      343.  On or about August 8, 2009, defendant BILEZIKCHYAN,

5  in a telephone conversation using coded language, told defendant

6  Moradians that he had sent some guys to help Moradians package

7  marijuana.

8      344.  On or about August 9, 2009, defendant BILEZIKCHYAN,

9  in a telephone conversation using coded language, told defendant

10  O. TEROGANESYAN that BILEZIKCHYAN and defendants K. YERKANYAN and

11  S. Torosyan wanted to bring narcotics to O. TEROGANESYAN's auto

12  body shop, MR Auto Body Collision, the next day in order to

13  package the narcotics, and O. TEROGANESYAN agreed.

14      345.  On or about August 10, 2009, defendant BILEZIKCHYAN,

15  in a telephone conversation using coded language, told defendant

16  O. TEROGANESYAN that they needed a compressor hose to package the

17  marijuana and asked O. TEROGANESYAN to cover the windows in his

18  office so that they could package the marijuana there, and O.

19  TEROGANESYAN said they could package the marijuana after the auto

20  body shop workers left for the day.

21      346.  On or about August 11, 2009, defendant BILEZIKCHYAN,

22  in a telephone conversation using coded language, discussed with

23  defendant O. TEROGANESYAN a plan to steal the marijuana that they

24  had helped to package for defendant Moradians, and O.

25  TEROGANESYAN agreed to make a copy of the keys for the U-Haul

26  truck that contained the packaged marijuana so that they could

27  steal the marijuana.

28

347. On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, spoke with defendant Sarkis Avedisian ("Avedisian") and asked Avedisian to hide marijuana on his property, and Avedisian agreed to do so.

348. On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that defendant K. YERKANYAN was on his way to assist O. TEROGANESYAN in stealing the U-Haul truck containing the packaged marijuana, and BILEZIKCHYAN told O. TEROGANESYAN to leave the U-Haul truck abandoned somewhere after they removed the marijuana; and the U-Haul truck was eventually left parked on Clifton Place in Glendale, California.

349. On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Moradians that other individuals had stolen the packaged marijuana from the U-Haul truck, and BILEZIKCHYAN claimed he had nothing to do with the theft of the marijuana.

350. On or about August 11, 2009, defendants BILEZIKCHYAN, K. YERKANYAN, and Davoodian met with defendant Moradians and pretended that K. YERKANYAN and Davoodian were rival claimants to BILEZIKCHYAN and Moradians for the stolen marijuana.

351. On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant O. TEROGANESYAN that BILEZIKCHYAN was in possession of the marijuana they had stolen from defendant Moradians.

352. On or about August 11, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant Gabrelyan that BILEZIKCHYAN was in possession of approximately

1  207 pounds of marijuana, and that the marijuana was worth

2  $450,000.

3    353.  On or about August 15, 2009, defendant BILEZIKCHYAN,

4  in a telephone conversation using coded language, told an

5  unindicted co-conspirator that the marijuana BILEZIKCHYAN and his

6  co-conspirators had stolen from the U-Haul truck was worth

7  $450,000, that BILEZIKCHYAN and his co-conspirators had divided

8  up the money, and that BILEZIKCHYAN's share was $150,000.

9    Conspiracy to Manufacture and Possess with Intent to

10   Distribute Marijuana

11   354.  In or around January 2010, defendant Ayranjian took

12  care of marijuana plants being grown at the marijuana facilities

13  operated by defendant H. KARAYAN and others.

14   355.  On or about January 14, 2010, defendant H. KARAYAN,

15  in a telephone conversation using coded language, discussed with

16  defendant TARVERDYAN starting a marijuana grow consisting of

17  approximately 500 plants and finding workers to help cultivate

18  the marijuana plants.

19   356.  On or about January 15, 2010, defendant H. KARAYAN,

20  in a telephone conversation using coded language, discussed with

21  defendant A. KARAYAN purchasing plant fertilizer for growing

22  marijuana plants.

23   357.  On or about January 16, 2010, defendant H. KARAYAN,

24  in a telephone conversation using coded language, discussed with

25  defendant Zhirayr Karayan ("Z. Karayan") drying, packaging, and

26  labeling marijuana.

27   358.  On or about January 16, 2010, defendant H. KARAYAN,

28  in a telephone conversation using coded language, discussed with

defendant GAMBARYAN growing marijuana, and H. KARAYAN said he had moved marijuana plants into his house.

359.  On or about January 17, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told defendant Z. Karayan that Z. Karayan should instruct defendant Ayranjian to go to defendant A. KARAYAN's marijuana facility, water the plants, and make sure to vacuum carefully at the location.

360.  On or about January 21, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant GAMBARYAN looking for another marijuana grow location.

361.  On or about January 22, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant Z. Karayan obtaining larger locations to grow marijuana, including one location that already had 150 marijuana plants inside of it.

362.  On January 22, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant A. KARAYAN a person who had a warehouse of marijuana plants for sale for $25,000, and H. KARAYAN said it was good deal.

363.  On or about January 25, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendant A. KARAYAN checking on the condition of their marijuana plants.

364.  On or about January 26, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, discussed with defendants A. KARAYAN and Z. Karayan growing marijuana plants.

365.   On or about January 28, 2010, defendant K. YERKANYAN, in a telephone conversation using coded language, discussed with defendant H. KARAYAN one of H. KARAYAN's marijuana grows, and H. KARAYAN said he would start cutting the marijuana from the marijuana grow that upcoming Saturday or Sunday.

366.   On or about February 6, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told defendant K. YERKANYAN that H. KARAYAN was at work setting up a marijuana grow.

367.   On or about February 8, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that H. KARAYAN had high quality marijuana available at $1,100 to $1,200 dollars for 12 ounces.

368.   On or about February 8, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told an unindicted co-conspirator that H. KARAYAN would need 200 clone marijuana plants for one of his marijuana grow locations, and 200 marijuana clone plants for another marijuana grow location.

369.   On or about February 8, 2010, defendants H. KARAYAN and R. TEROGANESYAN, in a telephone conversation using coded language, discussed their marijuana grow operations, and R. TEROGANESYAN said he was expanding his marijuana grow.

370.   On or about February 8, 2010, defendant H. KARAYAN, in a telephone conversation using coded language, told defendant R. TEROGANESYAN that H. KARAYAN had three marijuana grow sites operating and was opening a fourth, and that each grow site consisted of at least 150 marijuana plants.

371.  On or about February 8, 2010, defendant R. TEROGANESYAN, in a telephone conversation using coded language, spoke with defendant H. KARAYAN and offered to take possession of some of H. KARAYAN's marijuana plants, and R. TEROGANESYAN said he could fit approximately 200 of H. KARAYAN's marijuana plants at R. TEROGANESYAN's marijuana grow location.

372.  On or about February 10, 2010, defendant H. KARAYAN possessed approximately 2.38 kilograms of marijuana, a firearm, namely, a Beretta model 96 .40 caliber semi-automatic pistol, and ammunition, at his residence at 18536 Brasilia Drive, in Northridge, California.

373.  On or about April 26, 2010, defendant GAMBARYAN brought a propane tank and bamboo stakes to a marijuana growing facility that defendants H. KARAYAN, A. KARAYAN, GAMBARYAN, Grigor Garibyan ("Garibyan"), Aram Khachatryan ("A. Khachatryan"), Z. Karayan, and Hovannes Igarian ("Igarian") were operating at 8239 Lankershim Boulevard, Unit D, in North Hollywood, California (the "marijuana growing facility").

374.  On or about April 26, 2010, defendants GAMBARYAN and Garibyan unloaded the propane tank and bamboo stakes into the marijuana growing facility.

375.  On or about April 26, 2010, defendant Igarian arrived at the marijuana growing facility in an SUV, met defendant GAMBARYAN, and the two shook hands and entered the marijuana growing facility.

376.  On or about April 26, 2010, defendant Igarian exited the marijuana growing facility, backed his SUV up to the door of

the marijuana growing facility, and opened the rear hatch of his SUV.

377.  On or about April 26, 2010, defendant GAMBARYAN brought a black plastic bag of small marijuana plants out of the marijuana growing facility.

378.  On or about April 26, 2010, defendants GAMBARYAN and Igarian loaded the bag of marijuana plants into Igarian's SUV.

379.  On or about April 26, 2010, defendants H. KARAYAN, Garibyan, A. Khachatryan, and Z. Karayan met inside the marijuana growing facility.

380.  On or about April 26, 2010, defendants GAMBARYAN, A. Khachatryan, and Z. Karayan each possessed on his person a key to the door of the marijuana growing facility.

381.  On or about April 26, 2010, defendants H. KARAYAN, A. KARAYAN, GAMBARYAN, Garibyan, A. Khachatryan, Z. Karayan, and Igarian, and others known and unknown to the Grand Jury, possessed approximately 567 marijuana plants, as well as equipment used to grow marijuana, including one-gallon and five-gallon pots containing potting soil, high wattage overhead light bulbs with reflector shades, air conditioning units, dehumidifier units, fans, carbon filter systems, watering tubs, a submersible pump, and a carbon dioxide generator attached to a propane tank, all inside the marijuana growing facility.

Additional Drug Trafficking Activities Engaged in by Members of the Criminal Enterprise

382.  On or about March 9, 2007, defendant BILEZIKCHYAN, in a telephone conversation using coded language, spoke with a

Mexican Mafia member and discussed obtaining an ounce of drugs
from the Mexican Mafia member for approximately $600.

383.   On or about March 26, 2007, defendant BILEZIKCHYAN,
in a telephone conversation using coded language, told a Mexican
Mafia member that BILEZIKCHYAN had a kilogram of drugs for him.

384.   On or about October 19, 2007, defendant K. YERKANYAN,
in a telephone conversation using coded language, agreed to
inquire with others regarding supplying drugs to a Mexican Mafia
member.

385.   On or about December 5, 2007, defendant BILEZIKCHYAN,
in a telephone conversation using coded language, spoke with a
Mexican Mafia member and discussed obtaining methamphetamine from
the Mexican Mafia member.

386.   On or about December 9, 2007, defendant BILEZIKCHYAN,
in a telephone conversation using coded language, arranged with a
Mexican Mafia member to pick up drugs from the Mexican Mafia
member's home.

387.   On or about October 16, 2008, defendant HOVANISSIAN,
in a telephone conversation using coded language, discussed with
an unindicted co-conspirator smuggling drugs into the Los Angeles
County Jail, where HOVANISSIAN was incarcerated and selling drugs
within the jail.

388.   On or about November 2, 2008, defendant HOVANISSIAN
and an unindicted co-conspirator, in a telephone conversation
using coded language, discussed having the unindicted co-
conspirator's girlfriend visit HOVANISSIAN in jail to deliver
drugs to him.

1    389.   On or about November 3, 2008, defendant HOVANISSIAN
2    and an unindicted co-conspirator, in a telephone conversation
3    using coded language, discussed having the unindicted co-
4    conspirator's girlfriend and another woman visit HOVANISSIAN in
5    jail so that they could bring drugs to him as soon as possible.
6    390.   On or about November 6, 2008, defendant HOVANISSIAN,
7    in a telephone conversation using coded language, told an
8    unindicted co-conspirator that he was upset with a woman who
9    delivered drugs to HOVANISSIAN in jail because the drug order had
10   been messed up.
11   391.   On or about January 7, 2009, defendant HOVANISSIAN,
12   in a telephone conversation using coded language, discussed with
13   an unindicted co-conspirator smuggling fifteen grams of drugs to
14   HOVANISSIAN in jail through other inmates.
15   392.   On or about June 27, 2009, defendant DARBINYAN, in a
16   telephone conversation using coded language, told defendant
17   ZAKARYAN that DARBINYAN had to send narcotics to friends inside
18   prison.
19   393.   On or about July 12, 2009, defendant SHAROPETROSIAN,
20   in a telephone conversation using coded language, asked defendant
21   DARBINYAN to send him drugs in prison to distribute to others.
22   394.   On or about July 13, 2009, defendant DARBINYAN, in a
23   telephone conversation using coded language, told defendant
24   SHAROPETROSIAN that DARBINYAN was going to send SHAROPETROSIAN,
25   who was incarcerated, marijuana and methamphetamine for
26   distribution to other inmates.
27   395.   On or about July 14, 2009, defendant DARBINYAN, in a
28   telephone conversation using coded language, told defendant

1  SHAROPETROSIAN that DARBINYAN had acquired marijuana for

2  SHAROPETROSIAN.

3       396.  On or about October 19, 2009, defendant DARBINYAN, in

4  a telephone conversation using coded language, asked defendant

5  Ramirez for heroin because DARBINYAN wanted to send it to someone

6  in prison.

7       397.  On or about October 29, 2009, defendant BILEZIKCHYAN,

8  in a telephone conversation using coded language, asked defendant

9  DARBINYAN to send narcotics to an unindicted co-conspirator in

10 Miami, Florida, via overnight Federal Express.

11      398.  On or about October 29, 2009, defendant DARBINYAN, in

12 a telephone conversation using coded language, asked defendant K.

13 YERKANYAN to find someone to take a package containing narcotics

14 to a Federal Express location, and DARBINYAN said that DARBINYAN

15 and K. YERKANYAN should not go inside the Federal Express

16 location to avoid showing their faces.

17      399.  On or about October 29, 2009, defendant DARBINYAN, in

18 a telephone conversation using coded language, told an unindicted

19 co-conspirator to put a fake name and address on the return label

20 of the Federal Express package containing narcotics.

21      400.  On or about October 30, 2009, defendant DARBINYAN

22 caused a Federal Express package containing approximately 216

23 grams of marijuana to be sent to Miami, Florida.

24      401.  On or about November 17, 2009, defendant K.

25 YERKANYAN, in a telephone conversation using coded language,

26 discussed with defendant GAMBARYAN drugs that were supposed to be

27 sent into prison, and GAMBARYAN said that two grams were supposed

28

1   to be delivered into prison, but only one gram of drugs had

2   arrived at the prison.

3       402.   On or about November 21, 2009, defendant K.

4   YERKANYAN, in a telephone conversation using coded language, told

5   defendant FERMANYAN to bring him an unspecified quantity of

6   marijuana, and FERMANYAN agreed to do so.

7       403.   On or about February 8, 2010, defendant FERMANYAN, in

8   a telephone conversation using coded language, told defendant K.

9   YERKANYAN that FERMANYAN had lots of Oxycodone, and K. YERKANYAN

10  told FERMANYAN to bring him Oxycodone.

11      Illegal Gambling Business

12      404.   On or about December 28, 2009, defendants

13  BILEZIKCHYAN and H. KARAYAN, in a telephone conversation using

14  coded language, discussed paying the rent for a gambling location

15  at 3450 Cahuenga Boulevard, in Los Angeles, California.

16      405.   On or about January 14, 2010, defendant H. KARAYAN,

17  in a telephone conversation using coded language, spoke to an

18  unindicted co-conspirator about working as a waitress at an

19  upcoming poker tournament that he was organizing.

20      406.   On or about January 18, 2010, defendants H. KARAYAN

21  and R. TEROGANESYAN, in a telephone conversation using coded

22  language, discussed hiring three dealers and at least three

23  waitresses for a poker tournament they were organizing the next

24  evening, and R. TEROGANESYAN said that they should bring about

25  5,000 gambling chips and that there should be enough players for

26  three gambling tables.

27      407.   On or about January 18, 2010, defendant GAMBARYAN, in

28  a telephone conversation using coded language, told defendant H.

1 KARAYAN that he would contact a dealer about working at their

2 poker tournament the next evening, and GAMBARYAN said he would be

3 organizing another gambling game in two days.

4     408. On or about January 18, 2010, defendant H. KARAYAN,

5 in a telephone conversation using coded language, spoke to an

6 unindicted co-conspirator about working as a dealer at the poker

7 tournament the next evening, and H. KARAYAN told the dealer to

8 contact other dealers and tell them to dress nicely because there

9 would be high rollers at the poker tournament.

10     409. On or about January 18, 2010, defendant H. KARAYAN,

11 in a telephone conversation using coded language, spoke to an

12 unindicted co-conspirator about working as a waitress at the

13 poker tournament the next evening in which the first place prize

14 would be $5,000, and H. KARAYAN said he would be hiring four

15 waitresses for three gambling tables.

16     410. On or about January 19, 2010, defendants H. KARAYAN

17 and GAMBARYAN, in a telephone conversation using coded language,

18 discussed meeting at the poker tournament that evening.

19     411. On or about January 21, 2010, defendants H. KARAYAN

20 and R. TEROGANESYAN, in a telephone conversation using coded

21 language, discussed a gambler who owed them approximately $4,000

22 from the poker tournament they had organized two days before.

23     412. On or about January 22, 2010, defendants H. KARAYAN

24 and R. TEROGANESYAN, in a telephone conversation using coded

25 language, discussed a gambling tournament they had organized that

26 was currently taking place, and R. TEROGANESYAN said there was a

27 lot of money on the table and that many people had arrived so he

28 was going to open a second table.

413.   On or about January 23, 2010, defendant GAMBARYAN, in a telephone conversation using coded language, told defendant H. KARAYAN that he was organizing a gambling tournament that would take place in approximately one week, in which there would be $500 buy-ins, a first place prize of $10,000, and a minimum of four to five tables, and H. KARAYAN agreed to begin soliciting as many players as he could find for this tournament.

414.   On or about January 23, 2010, defendant R. TEROGANESYAN, in a telephone conversation using coded language, told defendant H. KARAYAN that the gambling tournament the night before had gone until 11:30 a.m. the next day.

415.   On or about January 25, 2010, defendants H. KARAYAN and R. TEROGANESYAN, in a telephone conversation using coded language, discussed what amounts to pay waitresses who worked at their poker tournament, and R. TEROGANESYAN said the next game would be the following day.

416.   On or about January 27, 2010, defendant R. TEROGANESYAN, in a telephone conversation using coded language, told defendant H. KARAYAN that the gambling tournament the night before had gone well and that many players owed them money, and R. TEROGANESYAN said this was business and he needed his money.

417.   On or about January 27, 2010, defendants H. KARAYAN and GAMBARYAN, and others known and unknown to the Grand Jury, possessed a poker table marked "Power Poker" with an Armenian crest in the center, thousands of gambling chips, and gambling pay-owe ledgers, listing amounts bet and owed, at 4055 Lankershim Boulevard, in Los Angeles, California.

418. On or about February 2, 2010, defendant R. TEROGANESYAN, in a telephone conversation using coded language, mentioned a gambling player who would pay him between $10,000 and $15,000, and R. TEROGANESYAN discussed with defendant H. KARAYAN getting ready for a gambling game and hiring enough employees.

419. On or about February 10, 2010, defendant H. KARAYAN, and others known and unknown to the Grand Jury, possessed two gambling tables, thousands of gambling chips, and other gambling paraphernalia, at 13847 Saticoy Street, in Los Angeles, California.

420. On or about May 13, 2010, defendant GAMBARYAN, and others known and unknown to the Grand Jury, possessed a poker table, thousands of gambling chips, and gambling pay-owe sheets, at 13429 Friar Street, in Los Angeles, California.

Additional Acts Related to the Criminal Enterprise

421. On or about January 9, 2007, defendant BILEZIKCHYAN, in a telephone conversation using coded language, agreed to provide a firearm to a Mexican Mafia member.

422. On or about January 19, 2007, defendant HOVANISSIAN, in a telephone conversation using coded language, spoke with a Mexican Mafia member and discussed protection that the Mexican Mafia member would provide to HOVANISSIAN.

423. On or about January 19, 2007, defendant BILEZIKCHYAN, in a telephone conversation using coded language, asked a Mexican Mafia member to help protect defendant HOVANISSIAN in jail.

424. On or about January 29, 2007, defendant BILEZIKCHYAN, in a telephone conversation using coded language, discussed with a Mexican Mafia member how defendant DARBINYAN, who was

1  incarcerated, could send the Mexican Mafia member money collected
2  from other prison inmates.

3       425.  On or about March 26, 2007, defendant BILEZIKCHYAN,
4  in a telephone conversation using coded language, told a Mexican
5  Mafia member that defendant DARBINYAN had money collected from
6  prison inmates for the Mexican Mafia member.

7       426.  On or about April 19, 2007, defendant K. YERKANYAN,
8  in a telephone conversation using coded language, identified
9  himself to a Mexican Mafia member as an Armenian Power gang
10  member using the gang moniker "Guilty."

11      427.  On or about December 15, 2007, defendant
12  BILEZIKCHYAN, in a telephone conversation using coded language,
13  offered advice and assistance to a Mexican Mafia member who
14  recently had a significant amount of money seized by police, and
15  BILEZIKCHYAN told the Mexican Mafia member that BILEZIKCHYAN
16  would be there to support him.

17      428.  On or about November 5, 2008, defendant HOVANISSIAN,
18  in a telephone conversation using coded language, discussed with
19  defendant H. KARAYAN the status of other Armenian Power gang
20  members and associates who were in custody, and HOVANISSIAN and
21  H. KARAYAN discussed a prior shooting they had been charged with
22  in 2003.

23      429.  On or about March 8, 2009, defendant DARBINYAN, in a
24  telephone conversation using coded language, discussed with
25  defendant MORENO, a Mexican Mafia member, the fact that MORENO
26  had finally been let out of prison and that prison officials had
27  investigated MORENO for his involvement in disturbances that had
28  occurred inside prison.

430.   On or about April 25, 2009, defendant DARBINYAN, in a telephone conversation using coded language, complained to defendant SHAROPETROSIAN about police officers surveilling him, and DARBINYAN told SHAROPETROSIAN that he did not care if he went to jail for five or six years because he can do the time.

431.   On or about April 25, 2009, defendant DARBINYAN, in a telephone conversation using coded language, told defendant SHAROPETROSIAN that DARBINYAN is a validated associate of the Mexican Mafia.

432.   On or about June 27, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant SHAROPETROSIAN two Mexican Mafia members who were father and son, and DARBINYAN referred to his close relationship with defendant MORENO, another Mexican Mafia member.

433.   On or about July 8, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with an unindicted co-conspirator that prison authorities had identified the unindicted co-conspirator as an Armenian Power gang member, and DARBINYAN said that prison authorities had done so due to the unindicted co-conspirator's association with DARBINYAN.

434.   On or about July 8, 2009, defendant DARBINYAN, in a telephone conversation using coded language, discussed with defendant SHAROPETROSIAN sending money to a Mexican Mafia associate for protection in prison.

435.   On or about July 17, 2009, defendant BILEZIKCHYAN, in a telephone conversation using coded language, told defendant DARBINYAN that BILEZIKCHYAN was going to visit a senior Mexican Mafia member and discuss money.